UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | |
|---|---|
| RYAN FRYE, | ) |
| | ) |
| Plaintiff, | ) Case No. 21-CV-1272 |
| | ) |
| vs. | ) |
| | ) Judge Sara Darrow |
| CITY OF LINCOLN, a Municipal Corporation, | ) |
| Lincoln Police Sgt. KEVIN LYNN, Individually | ) Magistrate Judge Jonathan E. Hawley |
| and as Agent or Employee of City of Lincoln, | ) |
| Lincoln Police Corporal SHAWN PETTIT, | ) |
| Individually and as Agent or Employee of | ) |
| City of Lincoln, Lincoln Police Chief | ) |
| PAUL ADAMS, Individually and as Agent | ) |
| or Employee of City of Lincoln, | ) |
| | ) |
| Defendants. | ) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants CITY OF LINCOLN, KEVIN LYNN, SHAWN PETTIT, and PAUL ADAMS by and through their attorneys, CHARLES HERVAS and KALEAH AULT of HERVAS, CONDON & BERSANI, P.C., and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7.1, move this Honorable Court for an order granting summary judgment in their favor.

## INTRODUCTION

Plaintiff Ryan Frye alleges his constitutional rights were violated when he was tased at the Logan County Jail after being arrested for domestic violence and unlawful restraint. Specifically, Frye claims that on September 27, 2020, Sergeant Lynn and Corporal Pettit used excessive force against him while in the sally port of the Logan County jail where he was tased by Sgt. Lynn during a physical altercation with the police. Additionally, Frye claims that Police

Chief Paul Adams failed to properly train and supervise Sgt. Lynn and Cpl. Pettit. Frye also raises a state battery claim and an indemnification claim.

Defendants now move for summary judgment contending the force used was reasonable in light of the circumstances. Alternatively, Sgt. Lynn and Cpl. Pettit are entitled to qualified immunity because the officers acted reasonably and not in violation of clearly established constitutional standards. Further, the *Monell* claim against Chief Adams lacks evidence, and without an underlying constitutional violation, Frye cannot state a *viable* claim against the Chief. Finally, Frye fails to state a claim for battery or indemnification. Therefore, Defendants are entitled to summary judgment in their favor.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

*Parties*

1. Plaintiff Ryan Frye was arrested on September 27, 2020, by the Lincoln Police Department (Ex. A, Lynn Dep., pp. 30-31; Ex. C, Pettit Dep., p. 25).

2. At all relevant times, Kevin Lynn served as a police Sergeant for the Lincoln Police Department (Ex. A, Lynn Dep., pp. 15-16).

3. At all relevant times, Shawn Pettit served as a Corporal for the Lincoln Police Department (Ex. C, Pettit Dep., pp. 19-20).

4. At all relevant times, Paul Adams served as the Lincoln Police Department Police Chief (Ex. G, Adams Dep., p. 7).

5. At all relevant times, the City of Lincoln was a municipal corporation within the State of Illinois (Answer to Complaint, ¶ 5).

*Plaintiff Ryan Frye's Arrest*

6. In the early morning hours of September 27, 2020, multiple officers arrived at 826 N. McLean[1] in response to a call made because Frye was committing domestic violence against his then girlfriend, Wendy Livingston (Ex. A, Lynn Dep., pp. 28, 30-31; Ex. B, Frye Dep., p. 9, 13, 33; Ex. C, Pettit Dep., p. 23).

7. In the basement of 826 N. McLean, Sgt. Lynn made contact with Frye, who was in handcuffs for officer safety and due to the nature of the call. Sgt. Lynn also met with Officer Eimer, and identified Wendy Livingston, who was injured and lying on a mattress in the basement (Ex. A, Lynn Dep., pp. 28-31).

8. Ms. Livingston had a visible injury to her lip (Ex. A, Lynn Dep., p. 30).

9. Officer Eimer escorted Frye from the basement to the house's rear door, where Cpl. Pettit took custody of Frye (Ex. C, Pettit Dep., p. 23).

10. Frye was arrested for domestic battery and unlawful restraint, and he was agitated and upset (Ex. A, Lynn Dep., pp. 30-31; Ex. B, Frye Dep., p. 22; Ex. C, Pettit Dep., p. 25).

11. While being escorted from the basement to Cpl. Pettit's squad vehicle, Frye repeatedly stopped, despite officers instructing Frye to continue moving (Ex. B, Frye Dep., pp. 29-31; Ex. C, Pettit Dep., pp. 27-28).

12. Frye refused to enter the squad vehicle immediately (Ex. B, Frye Dep., pp. 28-29; Ex. C, Pettit Dep., p. 39).

---

[1] Defendants note that Sgt. Lynn misspoke in his deposition, stating that Frye was arrested at 828 N. McLean. Frye was arrested at 826 N. McClean in Lincoln, Illinois.

13. Once Frye entered the squad vehicle Cpl. Pettit drove Frye to the Logan County Jail (Ex. B, Frye Dep., p. 31; Ex. C, Pettit Dep., pp. 29-30).

14. Frye ultimately pleaded guilty to domestic violence and was sentenced to five years of incarceration (Ex. B, Frye Dep., pp. 12-13).

*Logan County Jail COVID Policies and Procedures*

15. In response to the COVID 19 pandemic, the Logan County Jail instituted a series of policies to combat COVID 19 entering the jail. (Ex. C, Pettit Dep., pp. 32-35; Ex. D, Neitzel Dep., pp. 10-12, 37-41).

16. The jail significantly limited accepting custody of arrestees, however, domestic violence perpetrators were still accepted by the jail (Ex. D, Neitzel Dep., pp. 38-39).

17. Before an arrestee could be booked, he had to complete a COVID screening questionnaire and have his temperature taken (Ex. C, Pettit Dep., pp. 32-35; Ex. D, Neitzel Dep., pp. 10-12, 37-41).

*Plaintiff Ryan Frye's Time in the Logan County Jail Sally Port*

18. Cpl. Pettit arrived at the Logan County Jail, parked his squad in the sally port[2] and secured his firearm before opening the passenger side door for Frye (Ex. E, Sally Port East Video, 00:26-00:57; Ex. C, Pettit Dep., p. 31).

---

[2] The sally port is a bay area that is attached to the jail. It has two garage doors on both the east and west sides. The sally port serves as the location to take detainees once they've been arrested and are brought to the jail to be dropped off (Ex. A, Lynn Dep., pp. 49-50; Ex. C, Pettit Dep., p. 30; Ex. D, Neitzel Dep., pp. 9-10).

19. The Logan County Jail sally port is equipped with two cameras that record video footage of the sally port. One camera is designated "Sallyport-East" and one is designated "Sallyport - West" (Ex. E, Sally Port East Video; Ex. F, Sally Port West Video).

20. Frye remained secured in handcuffs, with his hands behind his back (Ex. A, Lynn Dep., p. 51; Ex. B, Frye Dep., pp. 44, 50; Ex. C, Pettit Dep., p. 29; Ex. D, Neitzel Dep., p. 18).

21. Frye perceived a tension, and was upset and agitated (Ex. B, Frye Dep., pp. 22, 45; Ex. D, Neitzel Dep., pp. 13, 43-44).

22. Cpl. Pettit, Deputy Phillips, Sgt. Lynn, Correctional Officer Neitzel and Correctional Officer Denovsky entered the sally port while Frye was being processed (Ex. A, Lynn Dep., p. 52; Ex. C, Pettit Dep., p. 31; Ex. E, Sally Port East Video, 02:45; Ex. F, Sally Port West Video, 01:54).

23. Frye was known within the department due to his number of arrests. Frye was approximately 10 years old when he had his first interaction with Sgt. Lynn. Sgt. Lynn was aware that most of Frye's incidents involved batteries, assaults, or attempted batteries (Ex. A, Lynn Dep., pp. 23-25; 27; Ex. C, Frye Dep., p. 12).

24. Due to previous convictions for crimes such as aggravated battery, domestic battery, and criminal damage to property, Frye had previously been incarcerated at the Logan County Jail four times (Ex. C, Frye Dep., p. 12).

25. Officers present when Frye was tased, including the Defendant Officers, knew Frye to be someone who fought with law enforcement, had a history of violence, and was

directly threatening officers that night.[3] (Ex. A, Lynn Dep., pp. 30, 81; Ex. C, Pettit Dep., pp. 6-7; 53-56; Ex. D, Neitzel Dep., pp. 43, 46).

26. Frye exited Cpl. Pettit's squad car and immediately refused to cooperate with officers (Ex. E, Sally Port East Video, 00:57–1:51; Ex. F, Sally Port West Video, 01:49–02:45; Ex. A, Lynn Dep., pp. 53-55; Ex. B, Frye Dep., pp. 38-39; Ex. C, Pettit Dep., pp. 31-32; Ex. D, Neitzel Dep., pp. 9-12; 44-45).

27. Frye knew he had to complete the screening questionnaire and have his temperature taken as part of the intake process and purposefully took action to prevent the officers from completing the intake questionnaire and taking his temperature (Ex. A, Lynn Dep., pp. 53-55; Ex. B, Frye Dep., pp. 36, 38-39; Ex. C, Pettit Dep., p. 32; Ex. D, Neitzel Dep., pp. 11, 16).

28. When Officer Neitzel attempted to complete the intake screening, Frye refused to answer the questions and moved his head away from the forehead thermometer repeatedly (Ex. A, Lynn Dep., pp. 54-55; Ex. B, Frye Dep., pp. 46, 59, 61-62, 69; Ex. C, Pettit Dep., pp. 31-32; Ex. D, Neitzel Dep., pp. 11-12; Ex. E, Sally Port East Video, 1:15-1:53; Ex. F, Sally Port West Video, 2:05-02:45).

29. After Officer Neitzel attempted to take Frye's temperature multiple times, but failed to do so, Sgt. Lynn came forward, took the thermometer from Neitzel's hand, and approached Frye (Ex. A, Lynn Dep., pp. 56-58; Ex. B, Frye Dep., pp. 37-38; Ex. D, Neitzel

---

[3] Defendants note that Frye will deny he threatened the officers in the sally port. However, it is undisputed that the officers perceived Frye to be uncooperative and agitated. Regardless, the video evidence conclusively shows an aggressive move by Frye towards Sgt. Lynn (Ex. E, Sally Port East Video, 1:53-1:55: Ex. F, Sally Port West Video, 2:46-2:50).

Dep., pp. 15-16; Ex. E, Sally Port East Video, 1:51-1:54; Ex. F, Sally Port West Video, 2:45-2:48).

30. As Sgt. Lynn approached Frye with the thermometer, Frye quickly moved towards Sgt. Lynn while bringing his shoulders and head forward, quickly moving his body closer to Sgt. Lynn (Ex. A, Lynn Dep., p. 56; Ex. B, Frye Dep., p. 70; Ex. C, Pettit Dep., pp. 43-46; Ex. D, Neitzel Dep., p. 17; Ex. E, Sally Port East Video, 1:53-1:55: Ex. F, Sally Port West Video, 2:46-2:50).

31. When Frye lunged aggressively at Sgt. Lynn, Cpl. Pettit feared that Frye would head butt Sgt. Lynn (Ex. C, Pettit Dep., pp. 43-44; 56-57).

32. Cpl. Pettit was standing behind Frye. When Frye lunged forward aggressively towards Sgt. Lynn, Cpl. Pettit grabbed and shoved Frye into the backseat of the police vehicle to create a reactionary gap and move Frye away from the officers (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 44-46; Ex. E, Sally Port East Video, 1:53-1:57; Ex. F, Sally Port West Video, 2:48-2:52).

33. Frye actively resisted Cpl. Pettit. During Frye's struggle with Cpl. Pettit, Sgt. Lynn removed his taser from his belt and tased Frye in the back one time, for one five-second taser cycle (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 63-64; Ex. E, Sally Port East Video, 01:55-02:00).

34. After Frye was tased, his temperature was taken, and the rest of the booking process was completed (Ex. A, Lynn Dep., p. 84; Ex. D, Neitzel Dep., pp. 13-14).

*Officer Training*

35. Officers at the Lincoln Police Department, including Sgt. Lynn and Cpl. Pettit are trained and certified in the use of tasers (Ex. A, Lynn Dep., pp. 10-13; Ex. C, Pettit Dep., pp. 62-65; Ex. G., Adams Dep., pp. 11-12; 35-36).

36. Officers at the Lincoln Police Department, including Sgt. Lynn and Cpl. Pettit are trained in the use of force (Ex. A, Lynn Dep., pp. 35-37; Ex. C, Pettit Dep., pp. 14, 17; Ex. G, Adams Dep., pp. 9, 29-30, 33-34).

37. The Lincoln Police Department utilizes the Lexipol system for additional training, which includes daily training briefs (Ex. A, Lynn Dep., pp. 35-36; Ex. C, Pettit Dep., pp. 14-15; Ex. G, Adams Dep., pp. 28, 30).

38. Policy 300 of the Lincoln Police Department—Use of Force. Policy 300 covers the types, scope, and limitations on use of force (Ex. H, Policy 300). Officers are trained on each policy (Ex. A, Lynn Dep., p. 38; Ex. C, Pettit Dep., pp. 13-14; Ex. G, Adams Dep., pp. 28-30).

39. Policy 304 of the Lincoln Police Department—Electronic Control Devices. Policy 304 regulates use of tasers (Ex. I, Policy 304). Officers are trained on each policy (Ex. G, Adams Dep., pp. 33-36).

## ARGUMENT

**I. SUMMARY JUDGMENT STANDARD AND UNEQUIVOCAL VIDEO EVIDENCE.**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a, c). The mere existence of a factual dispute will not preclude the granting of a

motion for summary judgment where the dispute does not involve a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are identified by the substantive law involved, and to constitute a "genuine issue," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Id*.

Importantly, the non-movant is only entitled to reasonable inferences from the facts presented, not those only supported by speculation or conjecture. *Dawson v. Brown*, 803 F.3d 829, 834 (7th Cir. 2015). And the non-movant's factual account is not to be credited if it is "blatantly contradicted" by video evidence. *Smith v. Finkley*, No. 20-1754, 2021 WL 3660880, at *1 (7th Cir. Aug. 18, 2021) (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007). "This is because on summary judgment we view the facts in the light most favorable to the nonmovant only if there is a genuine dispute about those facts." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (*citing Scott*, 550 U.S. at 378-81).

The video from the Lincoln Police Department sally port captures the entire incident in question (Def. SOF, ¶¶ 19, 26-34). There are two camera angles, that combined, provide a clear view of the incident. The quality of the video is good, and while there is no sound, the video speaks for itself. Frye does not contest the authenticity of the sally port videos. Importantly, excessive force under the Fourth Amendment is measured by "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 397 (1989). If key events are captured on video, the court must view the "facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

The sally port videos conclusively show Frye failing to cooperate with the booking process, aggressively moving towards Sgt. Lynn, and actively resisting Cpl. Pettit (Def. SOF, ¶¶ 28-33). The Seventh Circuit notes that video evidence of a police encounter trumps any

9

subjective declaration of intent by a plaintiff. *Brooks v. City of Aurora*, 653 F.3d 478, 484 (7th Cir. 2011). Further, the Seventh Circuit relies on the Supreme Court decision in *Scott* to resolve the legal question of whether an officer's actions were reasonable when video conclusively establishes the conduct of the plaintiff. *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). The Defendants contend that the video evidence supports summary judgement and compels dismissal of this case.

## II. THE USE OF FORCE, INCLUDING USE OF A TASER, WAS REASONABLE UNDER FOURTH AMENDMENT LAW.

The fundamental question in an excessive force claim is whether the totality of the circumstances justified a particular seizure. *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985). And whether the seizure was justified is measured from the perspective of a reasonable officer on the scene, including what the officer knew at the time, without 20/20 hindsight. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). In fact, the Supreme Court shuns Monday morning quarterbacking, and expects courts to view an officer's actions in light of the "tense, uncertain, and rapidly evolving" environment they are forced to make split-second decisions within. *Graham*, 490 U.S. at 396-397. The Fourth Amendment's standard for assessing whether the amount of force an officer used was excessive or reasonable is objective, based on the facts and circumstances confronting the officer regardless of underlying intent or motivation. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

*Graham* lays out a distinct three-part test for evaluating force cases: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest. *Graham*, 490 U.S. at 395. Here, all three *Graham* factors weigh in Sgt. Lynn and Cpl. Pettit's

favor. However, the court's ultimate goal in examining the factors is to determine "whether the force used to seize the suspect was excessive in relation to the danger he posed . . . if left unattended." *Dawson*, 803 F.3d 829 (citing *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011). And if there are sufficient undisputed material facts to establish the officer acted reasonably under the circumstances, the court must resolve the issue as a matter of law, instead of "allow[ing] a jury to 'second-guess' the officer's actions."

### a. *Frye was under arrest for domestic violence, he refused to comply with booking procedures, and he physically threatened and resisted the officers.*

The first *Graham* factor is "the severity of the crime at issue." *Graham*, 490 U.S. at 396. This factor weighs in favor of Sgt. Lynn and Corporal Pettit. Frye was arrested for domestic violence and unlawful restraint (Def. SOF, ¶¶ 6-8, 10). Frye was sentenced to five years of incarceration for what occurred in that home before police arrived (Def. SOF, ¶ 14). Second, officers were aware of Frye's reputation for violence (Def. SOF, ¶¶ 23-25). Third, and most importantly, once Frye was brought into the sally port and the intake process commenced, Frye threatened, resisted, and obstructed Correctional Officer Neitzel and Sgt. Lynn's attempt to book him, and then physically resisted and obstructed Sgt. Lynn's and Cpl. Pettit's attempts to regain physical control over him (Def. SOF, ¶¶ 25-33).

Resisting and obstructing an officer is a separate crime and is considered a serious offense. *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016); *see also* 720 Ill. Comp. Stat. Ann. 5/31-1(1)(a)(West 2010)("[a] person who knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his official capacity commits a Class A misdemeanor.". The sally port videos show Frye moving his head, arguing with officers, and refusing to complete the intake process (Def. SOF, ¶¶ 27-30).

11

Additionally, Frye physically threatened and actively resisted Sgt. Lynn and Cpl. Pettit (Def. SOF, ¶¶ 11-12, 25, 30-33). The video evidence conclusively shows Frye resisted and obstructed the police and the correctional officers after being arrested for an already serious crime.

### b. Frye threatened the officers' immediate safety.

The second *Graham* factor is "whether the suspect poses an immediate threat to the safety of the officers or others. *Graham*, 490 U.S. at 396. The video shows Frye resisting and preventing the officers from completing the booking process (Def. SOF, ¶¶ 26-33). As Sgt. Lynn approaches Frye, Frye aggressively lunges towards Sgt. Lynn and Cpl. Pettit grabs Frye to prevent a possible head butt (Def. SOF, ¶¶ 30-32). Although restrained by cuffs, Frye posed a substantial danger by his aggressive move toward Sgt. Lynn. Explanations of Frye's subjective intent are irrelevant to the objective video evidence of Frye's actions. Frye stepped forward, dropped his shoulders, dropped his head, and moved quickly towards Sgt. Lynn, and resisted Corporal Pettit's attempts to regain physical control over him (Def. SOF, ¶¶ 30-33).

### c. Frye was an active resistor.

The third *Graham* factor is whether the subject "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Notably, "[c]ourts generally hold that the use of a [t]aser against an actively resisting suspect does not violate clearly established law" nor is it constitutionally unreasonable. *Abbott v. Sangamon County,* Ill., 705 F.3d 706, 727 (7th Cir. 2013). Active resistance is contrasted with a scenario in which a taser cannot be used against a non-resisting, prone, and cuffed detainee. *Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015).

While Frye may hope to persuade the Court he was not an active resistor, he cannot avoid the video evidence displaying his aggressive movement towards Sgt. Lynn or his active

12

resistance to Cpl. Pettit. An arrestee is not permitted to actively resist the booking process. 720 Ill. Comp. Stat. Ann. 5/31-1(1)(a) (West 2010); *Dockery*, 911 F.3d 458 at 467–68 (active resistance during the booking process warranted arrestee being tased); *Forrest v. Prine,* 620 F.3d 739, 745 (7th Cir. 2010) (affirming summary judgment for officer who used a taser on a physically combative arrestee in a jail holding cell).

Cpl. Pettit responded appropriately in grabbing the charging Frye and stabilizing him into the back seat of the squad. Frye's active resistance is clearly displayed on the video and the use of a taser by Sgt. Lynn was appropriate under the Fourth Amendment. See *Abbot v. Sangamon County, Ill.*, 705 F.3d 706, 726-27 (7th Cir. 2013) (providing that using a taser to subdue a handcuffed and actively resisting subject does not violate clearly established law nor is it constitutionally unreasonable). Notably, Frye was subjected to one five-second taser cycle and was processed as soon as he was under control (Def. SOF, ¶¶ 33, 34).

**III.    IN THE ALTERNATIVE, SGT. LYNN AND CPL. PETTIT ARE ENTITLED TO QUALIFIED IMMUNITY.**

The familiar doctrine of qualified immunity limits the liability of local officials to violations of clearly established rights of which a reasonable person would have known. It applies to mistakes of fact, mistakes of law, or mistakes based on both fact and law. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Frye must prove his constitutional rights were violated, and that the right was "clearly established." *Id*. at 232. Courts may address either or both prongs first. *Id*. at 236.

"Clearly established" is a phrase of art and requires that "existing precedent must have placed the statutory or constitutional question" confronted "beyond debate." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). It demands that every reasonable officer must have known that his

or her actions were unlawful in the "specific[]" situation. *D.C. v. Wesby*, 138 S.Ct. 577, 590 (2018). Over and over, the Supreme Court has held that a right is "clearly established" *only* if it has been "defined with specificity" and reversed lower courts (often unanimously) for defining the right at issue at too high a level of generality. *Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019) (citing ten such rulings). More recently, in *City of Tahlequah, Oklahoma v. Bond*, 142 S.Ct. 9, (2021), the Supreme Court unanimously reiterated that lower courts have been "repeatedly told [] not to define clearly established law at too high a level of generality" and reversed a denial of qualified immunity because the lower court relied on "much too general" precedent. *Id*. at 11-12.

Frye must cite to clearly established law that he was subjected to unconstitutional force by Sgt. Lynn and Cpl. Pettit. None exists. Rather, the Seventh Circuit and sister circuits conclude that a resisting arrestee, even a handcuffed arrestee, may be tased as a tool of compliance. For instance, in *Abbott*, a handcuffed arrestee became agitated, moved his handcuffed hands out from behind his back, and began to struggle with officers. *Abbott*, 705 F.3d 706, 711–712. The Seventh Circuit upheld the lower court's findings that it was reasonable for the officers to tase the arrestee, regardless of the fact he was handcuffed, because officers could have reasonably believed the arrestee was resisting. *Id*. at 728-729. The Eleventh Circuit clearly permits tasing handcuffed individuals who are uncooperative or actively resisting. *See* i.e. *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (it was reasonable for officers to tase an uncooperative arrestee while leading him out of a hotel in handcuffs); *Buckley v. Haddock*, 292 F. App'x 791, 796 (11th Cir. 2008) (it is reasonable for an officer to tase a handcuffed arrestee on the side of the road who resisted arrest once handcuffed); *see also Yarnell v. Mendez*, 509 F.

Supp. 2d 421, 433 (D. Del. 2007) (it is reasonable and necessary for officers to tase handcuffed individuals who have resisted arrest and attempted to run from officers).

IV.     **FRYE HAS PRESENTED NO EVIDENCE TO SUPPORT A *MONELL* CLAIM AGAINST CHIEF ADAMS.**

A municipality's culpability is at its most tenuous where a claim turns on a failure to train. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (*citing Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985)). To allege a plausible training and supervision claim under *Monell*, a plaintiff must allege facts that amount to municipal employees acting with deliberate indifference to their rights. *See Connick*, 563 U.S. at 61. And the deliberate indifference standard requires that a municipal defendant disregard a known or obvious consequence of their conduct. *Id*. Such as when a city policy maker had actual or constructive notice that a particular omission in their training program causes employees to violate citizen's constitutional rights. In that case, the city may be deemed deliberately indifferent if the policy makers choose to retain that program. *Id*. This standard also ordinarily requires a pattern of "similar constitutional violations by untrained employees" to "demonstrate deliberate indifference for the purpose of failure to train." *Id*.

"Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *See Connick*, 563 U.S. at 61. Although the Supreme Court has never set a minimum number of incidents needed to allege a widespread practice, the Court has declined to find it when a plaintiff alleged two or three separate incidents. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005) (no municipal policy where the plaintiff introduced evidence that on three separate occasions prison guards improperly sprayed inmates with pepper spray); *Palmer v. Marion County*, 327 F.3d 588, 595 (7th Cir. 2003) (no widespread

15

policy where plaintiff introduced evidence of two situations in which the prison had placed black inmates in cell blocks that posed a threat to their safety).

As the Seventh Circuit explained:

> "The unifying theme in these decisions is the acknowledgment that the word 'widespread' must be taken seriously. It is not enough to demonstrate that policymakers could, or even should, have been aware of the unlawful activity because it occurred more than once. The plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision."

*Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006).

Frye brings a *Monell* claim against Chief Adams, alleging a failure to properly train and supervise. Frye limits his claim to the allegation that the "[d]eployment of a taser against Frye under the circumstances demonstrates a failure to train and supervise . . . ." Frye entirely fails to allege or demonstrate the existence of a pattern of similar incidents that would have put policymakers on notice that their failure to act amounted to deliberate indifference. Frye has not identified a widespread policy or practice, or implied that Lincoln Police Department officers had repeatedly tased individuals unlawfully. This falls woefully short of a valid *Monell* claim.

Sgt. Lynn and Cpl. Pettit received training on Lincoln Police Department Policies related to both tasers and use of force (Def. SOF, ¶¶ 38-39). This training includes the Lincoln Police Department's use of the Lexipol service to train officers daily on department policies (Def. SOF, ¶ 37). Sgt. Lynn and Cpl. Pettit were also trained in the use of a taser and use of force, and were certified in the use of a taser (Def. SOF, ¶¶ 35-36).

It is undisputed that Lincoln Police Department officers have written policies and training in place which cover the topics Frye alleges were inadequate. It is further undisputed that each of the Defendant Officers received training on these policies, are certified in the use of tasers, and

have been trained in the use of force and tasers. Frye presents no evidence of inadequate training or supervision. Frye's *Monell* claim is nothing more than a conclusory allegation that Frye was improperly tased and that the officers must not have been properly trained or supervised. Frye misses the mark by a wide margin of proving that Adams acted with deliberate indifference. The record shows the contrary. The allegations against Chief Adams are conclusory and without basis in fact.

Alternatively, the threshold issue in any § 1983 claim, including one brought under *Monell*, is whether the plaintiff has established the violation of a constitutional right. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). Should this Court find no constitutional violation, the *Monell* claim against Chief Adams fails.

## V. FRYE'S STATE LAW CLAIM FOR BATTERY SHOULD BE DISMISSED.

If the Court grants summary judgement on Frye's federal claims, his state law claim for battery should also fail. Illinois limits claims against police officers arising out of their efforts to enforce the law to "willful and wanton conduct." *See* 745 ILCS 10/2-202 (West 2016). Courts have repeatedly recognized that this standard is at least as high, if not higher than the objective reasonableness standard. "The Seventh Circuit and courts in this district agree that where an Illinois public employee's actions are found to be 'objectively reasonable' under the Fourth Amendment, those actions cannot be considered willful and wanton, and they will be entitled to immunity under the Tort Immunity Act." *Kapernekas v. Vill. of Stone Park*, No. 17 C 6040, 2019 WL 1543261, at *6 (N.D. Ill. Apr. 9, 2019) (*citing*, *inter alia*, *Horton v. Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018), *Gill v. Village of Melrose Park*, 35 F. Supp. 3d 956, 967-68 (N.D. Ill. 2014),

and *Rebolar ex rel. Rebolar v. City of Chicago, Ill.*, 897 F. Supp. 2d 723, 741-42 (N.D. Ill. 2012)). The same thing should happen here.

Alternatively, this Court could relinquish jurisdiction over the state law claims. *See Wright v. Associated Ins. Comp. Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). But because Frye's state law claim cannot survive if his federal claim fails, the more efficient choice is to reject the claim on the merits. *See, e.g., Bieneman v. City of Chicago*, 864 F.2d 463, 470 (7th Cir. 1988) (discussing supplemental jurisdiction and noting that "courts sometimes ought to dispose of everything at once").

## VI. FRYE'S INDEMNIFICATION CLAIM FAILS

Defendant City of Lincoln is obligated to indemnify their officers when legally appropriate. However, because there are no viable claims against the individual Defendants in this case, Defendant City of Lincoln is entitled to summary judgement on Frye's indemnification claim. *See* 745 ILCS 10/2-109 (public entity is not liable unless its employees are liable).

## CONCLUSION

For the foregoing reasons, Defendants should be granted summary judgment on all of Frye's claims.

Respectfully submitted,

HERVAS, CONDON & BERSANI, P.C.

**s/ Kaleah M. Ault**
KALEAH M. AULT, *Attorney for Defendants*

KALEAH M. AULT, ARDC No. 06332424
CHARLES E. HERVAS, ARDC No. 06185117
HERVAS, CONDON & BERSANI, P.C.
333 W. Pierce Road, Suite 195
Itasca, IL 60143-3156, P: 630-773-4774
kault@hcbattorneys.com; chervas@hcbattorneys.com

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# SPRINGFIELD DIVISION

| | |
|---|---|
| RYAN FRYE, | ) |
| | ) |
| Plaintiff, | ) Case No. 21-CV-1272 |
| | ) |
| vs. | ) |
| | ) Judge Sara Darrow |
| CITY OF LINCOLN, a Municipal Corporation, | ) |
| Lincoln Police Sgt. KEVIN LYNN, Individually | ) Magistrate Judge Jonathan E. Hawley |
| and as Agent or Employee of City of Lincoln, | ) |
| Lincoln Police Corporal SHAWN PETTIT, | ) |
| Individually and as Agent or Employee of | ) |
| City of Lincoln, Lincoln Police Chief | ) |
| PAUL ADAMS, Individually and as Agent | ) |
| or Employee of City of Lincoln, | ) |
| | ) |
| Defendants. | ) |

## CERTIFICATE OF SERVICE

I hereby certify that on **May 17, 2023** I electronically filed the foregoing ***Defendants' Motion for Summary Judgment*** with the Clerk of the District Court for the Central District of Illinois, Springfield Division, using the CM/ECF system, which will send notification to the following CM/ECF participants:

TO:   Mr. James M. Kelly
         Jason Jording
         Jay L. Cohen
         James Kelly Law Firm
         7817 N. Knoxville Ave.
         Peoria, IL 61614
         jim@jameskellylawfirm.com
         jasonj@jameskellylawfirm.com
         jayc@jameskellylawfirm.com

                                                **/s/ Kaleah M. Ault**
                                                KALEAH M. AULT, ARDC No. 06332424
                                                CHARLES E. HERVAS, ARDC No. 06185117
                                                *Attorneys for Defendants*
                                                HERVAS, CONDON & BERSANI, P.C.
                                                333 Pierce Road, Suite 195
                                                Itasca, IL 60143-3156   630-773-4774
                                                kault@hcbattorneys.com;
                                                chervas@hcbattorneys.com