THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RYAN FRYE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-1272 |
| | ) | |
| CITY OF LINCOLN, a Municipal | ) | |
| Corporation, Lincoln Police | ) | |
| Sergeant KEVIN LYNN, Individually | ) | |
| and as Agent or Employee of CITY OF | ) | |
| LINCOLN, Lincoln Police Corporal | ) | |
| SHAWN PETTIT, Individually and as | ) | |
| Agent or Employee of CITY OF LINCOLN, | ) | |
| Lincoln Police Chief PAUL ADAMS, | ) | |
| Individually and as Agent or Employee of | ) | |
| CITY OF LINCOLN, | ) | |
| | ) | |
| Defendants. | ) | **JURY DEMAND** |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, RYAN FRYE, by and through his attorneys, JAMES KELLY LAW FIRM, PC, and for his Response in Opposition to Defendants' Motion for Summary Judgment, states:

## I.    INTRODUCTION

This case is the classic, factual case to be resolved by a jury. There is a video of the incident. County jail workers are calmly interacting with Ryan Frye when an officer with a vendetta pushes through the crowd of officers to show he is the boss and tases a handcuffed Frye in the back. A jury is required to resolve whether tasing a handcuffed individual in the back is objectively reasonable under the circumstances when the Plaintiff is not resisting.

1

## II. RESPONSE TO DEFENDANTS' UNDISPUTED MATERIAL FACTS

### A. Undisputed Material Facts

1.      Plaintiff Ryan Frye was arrested on September 27, 2020, by the Lincoln Police Department (Ex. A, Lynn Dep., pp. 30-31; Ex. C, Pettit Dep., p. 25). **UNDISPUTED.**

2.      At all relevant times, Kevin Lynn served as a police Sergeant for the Lincoln Police Department (Ex. A, Lynn Dep., pp. 15-16). **UNDISPUTED.**

3.      At all relevant times, Shawn Pettit served as a Corporal for the Lincoln Police Department (Ex. C, Pettit Dep., pp. 19-20). **UNDISPUTED.**

4.      At all relevant times, Paul Adams served as the Lincoln Police Department Chief (Ex. G, Adams Dep., p. 7). **UNDISPUTED.**

5.      At all relevant times, the City of Lincoln was a municipal corporation within the State of Illinois (Answer to Complaint, ¶5). **UNDISPUTED.**

9.      Officer Eimer escorted Frye from the basement to the house's rear door, where Cpl. Pettit took custody of Frye (Ex. C, Pettit Dep., p. 23). **UNDISPUTED.**

13.     Once Frye entered the squad vehicle, Cpl. Pettit drove Frye to the Logan County Jail (Ex. B, Frye Dep., p. 31; Ex. C, Pettit Dep., pp. 29-30). **UNDISPUTED.**

15.     In response to the COVID 19 pandemic, the Logan County Jail instituted a series of policies to combat COVID 19 entering the jail (Ex. C, Pettit Dep., pp. 32-35; Ex. D, Neitzel Dep., pp. 10-12, 37-41). **UNDISPUTED.**

17.     Before an arrestee could be booked, he had to complete a COVID screening questionnaire and have his temperature taken (Ex. C, Pettit Dep., pp. 32-35; Ex. D, Neitzel Dep., pp. 10-12, 37-41). **UNDISPUTED.**

18.    Cpl. Pettit arrived at the Logan County Jail, parked his squad in the sally port and secured his firearm before opening the passenger side door for Frye (Ex. E, Sally Port East Video, 00:26-00:57; Ex. C, Pettit Dep., p. 31).  **UNDISPUTED.**

19.    The Logan County Jail sally port is equipped with two cameras that record video footage of the sally port.  One camera is designated "Sallyport-East" and one is designated "Sallyport-West" (Ex. E, Sally Port East Video; Ex. F, Sally Port West Video).  **UNDISPUTED.**

20.    Frye remained secured in handcuffs, with his hands behind his back (Ex. A, Lynn Dep., p. 51; Ex. B, Frye Dep., pp. 44, 50; Ex. C, Pettit Dep., p. 29; Ex. D. Neitzel Dep., p. 18).  **UNDISPUTED.**

22.    Cpl. Pettit, Deputy Phillips, Sgt. Lynn, Correctional Officer Neitzel, and Correctional Officer Denovsky entered the sally port while Frye was being processed (Ex. A, Lynn Dep., p. 52; Ex. C, Pettit Dep., p. 31; Ex. E, Sally Port East Video, 02:45; Ex. F, Sally Port West Video, 01:54).  **UNDISPUTED.**

### B.    Disputed Material Facts

References will be to the exhibits cited in the Defendants' Motion for Summary Judgment unless otherwise noted.

21.    Frye perceived a tension, and was upset and agitated (Ex. B, Frye Dep., pp. 22, 45; Ex. D, Neitzel Dep., pp. 13, 43-44).  **DISPUTED in that that Frye perceived a tension only with Defendant Lynn and was agitated. Exhibit B at pp. 22 and 37.**

25.    Officers present when Frye was tased, including the Defendant Officers, knew Frye to be someone who fought with law enforcement, had a history of violence, and was directly threatening officers that night (Ex. A, Lynn Dep., pp. 30, 81; Ex. C, Pettit Dep., pp. 6-7; 53-56; Ex. D, Neitzel Dep., pp. 43, 46).  **DISPUTED.  Exhibit B p. 39, Exhibit C p. 7, Exhibit D pp.**

**18, 25 – 26 and 44. Testimony is that Frye can be aggressive with law enforcement, but there is no evidence that he fought with law enforcement. There is no need to admit or dispute footnote 3. As it is argument. Moreover, as it is argument, it should be stricken from Defendants' undisputed facts.**

26. Frye exited Cpl. Pettit's squad car and immediately refused to cooperate with officers (Ex. E, Sally Port East Video, 00:57-01:51; Ex. F, Sally Port West Video, 01:49-02:45; Ex. A, Lynn Dep., pp. 53-55; Ex. B, Frye Dep., pp. 38-39; Ex. C, Pettit Dep., pp. 31-32; Ex. D, Neitzel Dep., pp. 9-12; 44-45). **DISPUTED to the extent that the statement implies that Frye did anything more than not answer COVID-19 screening questions and not have his temperature taken. Exhibit D pp. 11 – 12 and 25 – 27.**

27. Frye knew he had to complete the screening questionnaire and have his temperature taken as part of the intake process and purposefully took action to prevent the officers from completing the intake questionnaire and taking his temperature (Ex. A, Lynn Dep., pp. 53-55; Ex. B, Frye Dep., pp. 36, 38-39; Ex. C, Pettit Dep., p. 32; Ex. D, Neitzel Dep., pp. 11, 16). **DISPUTED.**

28. When Officer Neitzel attempted to complete the intake screening, Frye refused to answer the questions and moved his head away from the forehead thermometer repeatedly (Ex. A, Lynn Dep., pp. 54-55; Ex. B, Frye Dep., pp. 46, 59, 61-62, 69; Ex. C, Pettit Dep., pp. 31-32; Ex. D, Neitzel Dep., pp. 11-12; Ex. E, Sally Port East Video, 01:15-01:53; Ex. F, Sally Port West Video, 02:05-02:45). **DISPUTED that Frye moved his head away from the forehead thermometer repeatedly. Exhibit D p.11, Exhibit E and Exhibit F.**

29. After Officer Neitzel attempted to take Frye's temperature multiple times, but failed to do so, Sgt. Lynn came forward, took the thermometer from Neitzel's hand, and approached Frye

(Ex. A, Lynn Dep., pp. 56-58; Ex. B, Frye Dep., pp. 37-38, Ex. D, Neitzel Dep., pp. 15-16; Ex. E, Sally Port East Video, 01:51-01:54; Ex. F, Sally Port West Video, 02:45-02:48). **DISPUTED in that Corrections Officer Neitzel attempted to take Frys's temperature more than once and that Defendant Lynn rushed toward Corrections Officer Neitzel and grabbed the thermometer out of Corrections Officer Neitzel's hand. Exhibit D pp 15, 16, 20 and 48.**

30.     As Sgt. Lynn approached Frye with the thermometer, Frye quickly moved towards Sgt. Lynn while bringing his shoulders and head forward, quickly moving his body closer to Sgt. Lynn (Ex. A, Lynn Dep., p. 56; Ex. B, Frye Dep., p. 70; Ex. C, Pettit Dep., pp. 43-46; Ex. D, Neitzel Dep., p. 17; Ex. E, Sally Port East Video, 01:53-01:55; Ex. F, Sally Port West Video, 02:46-02:50). **DISPUTED.  Exhibit B pp. 56, 62, 65, 70 and 71. Exhibit D p. 17. Exhibit E time 1:53 – 1:57 and Exhibit F time 2:48 – 2:52.**

31.     When Frye lunged aggressively at Sgt. Lynn, Cpl. Pettit feared that Frye would head butt Sgt. Lynn (Ex. C, Pettit Dep., pp. 43-44; 56-57). **DISPUTED that Frye lunged aggressively at Defendant Lynn.  Exhibit B pp. 56, 62, 65, 70 and 71. Exhibit D pp. 17 and 24 - 25. Exhibit E time 1:53 – 1:57 and Exhibit F time 2:48 – 2:52.**

32.     Cpl. Pettit was standing behind Frye.  When Frye lunged forward aggressively towards Sgt. Lynn, Cpl. Pettit grabbed and shoved Frye into the backseat of the police vehicle to create a reactionary gap and move Frye away from the officers (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 44-46; Ex. E, Sally Port East Video, 01:53-01:57; Ex. F, Sally Port West Video, 02:48-02:52). **DISPUTED in that Defendant Pettit grabbed Frye in a choke hold and shoved him into the back seat of the police vehicle.  Exhibit B pp 44 – 45, 63 and 70. Exhibit D PP. 28 – 29. Exhibit E time 1:53 – 1:57 and Exhibit F time 2:48 – 2:52.**

33.     Frye actively resisted Cpl. Pettit.  During Frye's struggle with Cpl. Pettit, Sgt. Lynn removed his taser from his belt and tased Frye in the back one time, for one five-second taser cycle (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 63-64; Ex. E, Sally Port East Video, 01:55-02:00).

**DISPUTED except that Defendant Lynn tasered Frye in the back. Exhibit B pp. 44- 45, 50 and 52. Exhibit D p.22. Exhibit E time 1:55 – 2:00.**

35.     Officers at the Lincoln Police Department, including Sgt. Lynn and Cpl. Pettit, are trained and certified in the use of tasers (Ex. A, Lynn Dep., pp. 10-13; Ex. C, Pettit Dep., pp. 62-65; Ex. G, Adams Dep., pp. 11-12; 35-36).  **DISPUTED as the training records of Defendant Lynn do not reflect any certification for Taser Training Plaintiff Exhibit 1 and the training records of Defendant Pettit indicate that his last certification for Taser Training was 2018. Plaintiff Exhibit 2.**

36.     Officers at the Lincoln Police Department, including Sgt. Lynn and Cpl. Pettit, are trained in the use of force (Ex. A, Lynn Dep., pp. 35-37; Ex. C, Pettit Dep., pp. 14, 17; Ex. G, Adams Dep., pp. 9, 29-30, 33-34).  **DISPUTED.**

38.     Policy 300 of the Lincoln Police Department – Use of Force.  Policy 300 covers the types, scope, and limitations on use of force (Ex. H, Policy 300).  Officers are trained on each policy (Ex. A, Lynn Dep., p. 38; Ex. C, Pettit Dep., pp. 13-14; Ex. G, Adams Dep., pp. 28-30).

**DISPUTED except that Policy 300 of the Lincoln Police Department – Use of Force.  Policy 300 covers the types, scope, and limitations on use of force.**

37.     The Lincoln Police Department utilizes the Lexipol system for additional training, which includes daily training briefs (Ex. A, Lynn Dep., pp. 35-36; Ex. C, Pettit Dep., pp. 14-15; Ex. G, Adams Dep., pp. 28, 30).  **DISPUTED.**

39.     Policy 304 of the Lincoln Police Department – Electronic Control Devices.  Policy 304 regulates the use of tasers (Ex. I, Policy 304).  Officers are trained on each policy (Ex. G, Adams Dep., pp. 33-36).  **DISPUTED except that Policy 304 of the Lincoln Police Department – Electronic Control Devices.  Policy 304 regulates the use of tasers.**

### C.     Disputed Immaterial Facts

7.      In the basement of 826 N. McLean, Sgt. Lynn made contact with Frye, who was in handcuffs for officer safety and due to the nature of the call.  Sgt. Lynn also met with Officer Eimer, and identified Wendy Livingston, who was injured and lying on a mattress in the basement (Ex. A, Lynn Dep., pp. 28-31).  **This action involves excessive force on a pre-trial detainee, not excessive force during an arrest.  Therefore, the severity of the crime is irrelevant.  In any event, whether Livingston was lying on a mattress does not indicate the severity of the crime.  The statement is disputed also that the statement implies that Livingston was lying on a mattress due to an injury, Exhibit A at p. 31 and Exhibit B at p. 27.**

10.     Frye was arrested for domestic battery and unlawful restraint, and he was agitated and upset (Ex. A, Lynn Dep., pp. 30-31; Ex. B, Frye Dep., p. 22; Ex. C, Pettit Dep., p. 25).  **What Frye was arrested for and whether he was agitated or upset when arrested is irrelevant to whether he was the victim of excessive force in the salley port of the Logan County jail.  The statement is also disputed to the extent that Frye was agitated. Exhibit B at pp. 20 – 22.**

11.     While being escorted from the basement to Cpl. Pettit's squad vehicle, Frye repeatedly stopped, despite officers instructing Frye to continue moving (Ex. B, Frye Dep., pp. 29-31; Ex. C, Pettit Dep., pp. 27-28).  **Whether Frye repeatedly stopped while being escorted to the police vehicle is irrelevant to whether he was the victim of excessive force in the salley**

port of the Logan County jail.  **The statement is also disputed to the extent that this implies that Frye was resisting arrest. Exhibit B at pp. 29 – 31.**

D.      **Undisputed Immaterial Facts**:

6.      In the early morning hours of September 27, 2020, multiple officers arrived at 826 N. McLean in response to a call made because Frye was committing domestic violence against his then girlfriend, Wendy Livingston (Ex. A, Lynn Dep., pp. 28, 30-31; Ex. B, Frye Dep., pp. 9, 13, 33; Ex. C, Pettit Dep., p. 23).  **It is immaterial why the police were called to Frye's residence before he was arrested and transported to the Logan County jail where he was allegedly the victim of excessive force as a pre-trial detainee.**

8.      Ms. Livingston had a visible injury to her lip (Ex. A, Lynn Dep., p. 30).  **Whether Livingston had an injury to her lip is immaterial to the issue of whether Frye was allegedly the victim of excessive force as a pre-trial detainee.**

12.      Frye refused to enter the squad vehicle immediately (Ex. B, Frye Dep., pp. 28-29; Ex. C, Pettit Dep., p. 39).  **It is immaterial whether Frye entered a police vehicle immediately when he was arrested considering that this action involves excessive force against a pre-trial detainee.  In addition, whether Frye entered the police vehicle immediately has no relevance considering the time that elapsed between entering the police vehicle and the alleged excessive force that occurred in the salley port of the jail.**

14.      Frye ultimately pleaded guilty to domestic violence and was sentenced to five years of incarceration (Ex. B, Frye Dep., pp. 12-13).  **What offense Frye pleaded guilty to and the sentence is irrelevant to whether he was the victim of excessive force in the salley port of the Logan County jail.**

16.     The jail significantly limited accepting custody of arrestees, however, domestic violence perpetrators were still accepted by the jail (Ex. D, Neitzel Dep., pp. 38-39).  **Whether the Logan County jail significantly limited accepting custody of arrestees, but admitted alleged perpetrators of domestic violence is irrelevant to whether Frye was the victim of excessive force in the salley port of the Logan County jail.**

23.     Frye was known within the department due to his number of arrests.  Frye was approximately 10 years old when he had his first interaction with Sgt. Lynn.  Sgt. Lynn was aware that most of Frye's incidents involved batteries, assaults, or attempted batteries (Ex. A, Lynn Dep., pp. 23-25; 27; Ex. B [sic], Frye Dep., p. 12).  **Whether Frye's first encounter with Defendant Lynn was when he was 10 years old is irrelevant as is whether Defendant Lynn was aware but not involved in Plaintiff's prior incidents which allegedly involved batteries, assaults or attempted batteries is irrelevant to the issue whether Frye was the victim of excessive force in the salley port of the Logan County jail.**

24.     Due to previous convictions for crimes such as aggravated battery, domestic battery, and criminal damage to property, Frye had previously been incarcerated at the Logan County Jail four times (Ex. B [sic], Frye Dep., p. 12).  **Whether Frye was previously incarcerated four times in the Logan County jail for aggravated battery, domestic battery and criminal damage to property is irrelevant to whether he was a victim of excessive force in the salley port of the Logan County jail.**

34.     After Frye was tased, his temperature was taken, and the rest of the booking process was completed (Ex. A, Lynn Dep., p. 84; Ex. D, Neitzel Dep., pp. 13-14).  **What occurred after Frye was tasered is irrelevant.**

### E.  Additional Material Facts

1.      Frye was harassed on a number of occasions by Defendant Lynn before the night of the incident. Exhibit B, pp. 22 -24.

2.      Due to the previous harassment, Frye felt that Defendant Lynn had a vendetta against Plaintiff. Exhibit B, p. 22.

3.      Defendant Lynn was the Lincoln Police Department officer in charge of the arrest of Frye on the night of the incident. Exhibit C, p. 26.

4.      Defendant Pettitt is 5'10" tall and weighs 250 pounds. Exhibit C, p. 11.

5.      Frye was transported to the Logan County Jail in a police vehicle by Defendant Pettit by himself without any other law enforcement officers in the vehicle.  Exhibit C, p. 29.

6.      Frye willingly got out of the police vehicle when it was in the salley port of the Logan County jail. Exhibit C, p. 31. Exhibit E 1:12 - 1:18; Exhibit F 1:53 – 2:07.

7.      Frye was handcuffed behind his back the entire time he was in the salley port of the Logan County jail. Exhibit D, p. 18.

8.      Officer Ian Neitzel is a corrections officer at the Logan County jail and was on duty on September 27, 2020, the night of the alleged excessive force suffered by Frye. Exhibit D, p. 11.

9.      Other law enforcement officials present when the alleged excessive force occurred were Corrections Officers Neitzel and Robert Dunovsky, Logan County Deputy Phillips, and Lincoln Police Officers, Defendants Lynn and Pettit. Exhibit D, pp. 14 – 15.

10.     Frye wanted to speak to a Corrections Officer supervisor. Exhibit B, pp. 36 and 68.

11.     Frye wanted to talk to a supervisor as soon as possible. Exhibit B, pp. 39 and 62.

12.     Frye wanted to speak to a supervisor because he was afraid of Defendant Lynn and he wanted to insure that nothing happened. Exhibit B, pp. 37 and 60 - 62.

13.     The Corrections Officers backed off and asked Frye what was wrong. Exhibit D, p. 38.

14.     Frye did not have time to explain his concerns before Defendant Lynn arrived at the salley port. Exhibit B, pp. 37 – 38.

15.     It was the Corrections Officers' responsibility to perform the COVID screening for the jail. Exhibit C, p. 61 and Exhibit D, p. 16.

16.     If the COVID screening was not performed at the Logan County jail, it would have been performed in a hospital emergency room. Exhibit D, p. 42.

17.     Frye was not acting aggressively toward Corrections officer Neitzel. Exhibit D, pp. 25 – 26.  Exhibit E 1:18 – 1;53 and Exhibit F 2:12 – 2:46.

18.     Corrections Officer Neitzel did not feel physically threatened by Frye. Exhibit D, p. 27.

19.     Frye did not act aggressively toward anyone while he was in the salley port. Exhibit B, pp. 39 – 40 and Exhibit E 1:16 – 12:15: Exhibit F 1:53 – 13:10.

20.     Frye did not threaten anyone while Plaintiff was in the salley port. Exhibit B, pp.39, 47 – 48 and 56.  Exhibit D, p. 44.

21.     Defendant Lynn entered the salley port after all other law enforcement personnel were already in the salley port. Exhibit B, p. 36 and Exhibit F 1:47

22.     Defendant Lynn grabbed the thermometer from Corrections Officer Neitzel's hand while saying "Give me the damn thing." Exhibit D, pp. 15 -16 and Exhibit E 1:53 – 1;54: Exhibit F 2:46 – 2:49.

23.     Corrections Officer Neitzel did not indicate that Defendant Lynn could take the thermometer. Exhibit D, p. 16.

24.     After taking the thermometer, Defendant Lynn rushed at Frye. Exhibit D, p. 20 and Exhibit E 1:54 – 1:55.

25.     When Defendant Lynn rushed toward Frye, Defendant Pettit was about one foot from Frye, Corrections Officer Neitzel was about two feet from Frye, and Frye was about one foot from the police vehicle. Exhibit D, pp. 17 and 19.

26.     When Defendant Lynn rushed toward Frye, Frye did not know what Defendant Lynn was going to do and felt physically threatened. Exhibit B, pp. 45 – 46 and 47.

27.     Frye was in a corner with the car door behind him and had to brace himself. He could not back up, so he balled up because he had no defense. Exhibit B, pp. 44, 65, 68 and 70.

28.     Frye did not lunge at or try to charge Defendant Lynn when Defendant Lynn rushed at him. Exhibit B, pp. 56 and 71 and Exhibit E 1:54 – 1:57.

29.     Frye did not try to head butt anyone. Exhibit D, pp. 24 – 25.and Exhibit E 1:54 – 2:01; Exhibit F 2:44 – 2:59.

30.     When Frye went to crouch down, Defendant Pettit grabbed Frye's head or shoulders and put Frye in what felt like a "choke hold" but did not lock the hold. Exhibit B, pp. 44 - 45, 63 and 70 and Exhibit E 1:57 – 1:59; Exhibit F 2:49 – 2:52.

31.     Frye was then shoved into the back seat of the police vehicle. Exhibit D, pp. 28 – 29 and Exhibit F 2:52 – 2:54.

32.     As Frye was shoved into the back seat of the police vehicle, he was off balance and appeared to try to keep his balance as he was falling backward. Exhibit A, p.71 and Exhibit E 2:07 – 2:09; Exhibit F 2:54 – 3:00.

33.     Frye was face down in the vehicle with his feet outside the vehicle and Defendant Pettit holding him. Exhibit B, pp. 65 -66, Exhibit D, p. 21.

34. Defendant Pettit had physical control of Frye. Exhibit D, p.45.

35. Frye did not kick anyone. Exhibit D, p. 47 and Exhibit F 2:52 – 3:04.

36. Frye told the Defendants that he was not resisting. Exhibit B, p. 45.

37. Frye was then tasered. Exhibit D, pp. 20 and 22 and Exhibit F 2:56 – 2:58.

38. Defendant Lynn did not give any warning before he tasered Frye. Exhibit A, p. 72 and Exhibit D, p. 24.

39. When Frye was tasered by Defendant Lynn, Frye was chest down in the police vehicle with his feet on the ground. Exhibit D. p. 25 and Exhibit F 2:56 – 2:58 .

40. Frye was tasered in the back just above his handcuffs. Exhibit D, p. 20.

41. Before Frye was tasered, Corrections Officer Neitzel had grabbed one of Frye's hands. Exhibit D, pp. 22 – 23.

42. Corrections Officer Neitzel's hand was inches away from where Frye was tasered and he could see the taser probes go into Frye. Exhibit D, pp. 22 – 24.

43. Ryan Frye ended up in the back of the police vehicle with taser probes in his back. Exhibit A. p. 83.

## B. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the movant shows, through "materials in the record, including video tapes of the incident, depositions, documents, electronically stored information, affidavits or declarations, stipulations … admissions, interrogatory answers, or other materials" that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. Material facts are those that might affect the outcome of the suit under the applicable law. *Dawson v. Brown,* 803 F.3d 829 (7th Cir. 2015). In resolving a motion for summary judgment, "[t]he court has one task and one task only; to decide,

based on the evidence of record, whether there is any material dispute of fact that requires a trial."

*Payne v. Pauley*, 337 F.3d 767, 770 (7ᵗʰ Cir. 2003) and *Waldridge v. Am. Hoechst Corp.,* 24 F.3d, 918, 920 (7ᵗʰ Cir. 1994).

"Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, *supra*. "On summary judgment [a court] must view the facts and make all reasonable inferences in the light most favorable to the party opposing summary judgment." *Johnson v. Advocate Health and Hospitals Corporation,* 892 F.3d 887, 893 (7ᵗʰ Cir. 2018). "On summary judgment a court may not make credibility determinations, weight the evidence, or decide which inferences to draw from the facts; those jobs are for a fact finder. Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied. *Id*. At 773. "Summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7ᵗʰ Cir. 2010) (citing *Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7ᵗʰ Cir. 2009). Where the conduct of a suspect is open to interpretation, courts will not grant summary judgment. *Dockery v. Blackburn*, 911 F 3d 458 (7ᵗʰ Cir. 2018) (suspect barrel roll away from police may or may not have been an attempt to flee and question whether suspect posed a threat to police). "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed. Anderson v. Liberty Lobby, 477 U.S.242 (1986).

### C. ARGUMENT

**1. It is a jury question whether Defendants' conduct was objectively reasonable under the circumstances.**

Defendants are not entitled to judgment in their favor as the undisputed facts show Defendants' conduct was not objectively reasonable under the circumstances. The first prong of

the analysis to determine whether defendants should be held liable is whether defendants acted in an objectively reasonable manner under the circumstances. Excessive force claims require a fact based, case by case analysis. *Padula v. Lembach, 656 F 3d 595* (7th Cir. 2011)*.* When the alleged excessive force occurred, Frye had already been arrested and was in the status of a pre-trial detainee. The Fourteenth Amendment protects individuals from the use of excessive force by law enforcement officials.[1] The Due Process Clause protects a pre-trial detainee from the use of excessive force that amounts to punishment. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). The Courts must evaluate pre-trial detainee excessive force claims under an objective reasonableness standard, that is, whether the officers' actions were objectively reasonable under the facts and circumstances at the time. *Kingsley v. Hendrickson*, *supra*. The Supreme Court in *Kingsley,* indicated that the following objective factors are relevant, but not exclusive, in determining the reasonableness, or unreasonableness, of the use of force: the relationship between the need for the use of force and the amount of force used, the extent of plaintiff's injury, any effort made by the officer to temper or to limit the amount of force, the severity of the security problem at issue, the threat reasonably perceived by the officer, and whether the plaintiff was actively resisting.

In determining whether the use of force is permissible under the objective reasonableness standard, 'the court must assess the totality of the circumstances from the perspective of a reasonable officer on the scene.'" *Bayon v. Berkebile*, 29 F.4th 850, 854 (7th Cir. 2022)[2] (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Proper application of the reasonableness test

---

[1] Frye brought this action under both the Fourth and Fourteenth Amendments, but in Count I, "Excessive Force" alleged only a violation of the Fourth Amendment. This minor pleading defect is not sufficient to defeat Frye's claim as Frye's complaint put defendants on sufficient notice of the claim against them and the standard used by Courts to evaluate allegations of excessive force, "objective reasonableness" is essentially the same for alleged violations of both the Fourth and Fourteenth Amendments.

[2] Fourth Amendment caselaw can be used to a large extent to evaluate the claim of excessive force under the Fourteenth Amendment as the basic standard of evaluation under either Amendment is whether the use of force was objectively reasonable under the circumstances. *See*, *Kingsley v. Hendrickson*, *supra*.

requires careful attention to the facts and circumstances of each case. *Graham v. Connor*, *supra*. The Court in *Kingsley* emphasized that the officer's subjective state of mind is not relevant as the standard is one of objective reasonableness. The Court's ultimate goal in examining the totality of the circumstances is to determine whether the force used was excessive in relation to the danger posed. *Dawson v. Brown, supra.* In other words, force is only reasonable when it is proportional to the threat posed. *Alicea v. Thomas*, 815 F.3d 283 (7th Cir. 2016) and *Cyrus v. Town of Mukwonago,* 624 F 2d 856 (7th Cir. 2010). It is unreasonable for significant force to be used once a suspect has stopped resisting or evading arrest. *Alicea v. Thomas, supra.*

The evidence demonstrates that taken in a light most favorable to Frye, Defendants did not act in an objectively reasonable manner. As discussed below, the law is clear that it is excessive force to taser an already subdued or passively resisting suspect. Thus, Defendants must show that it is undisputed that Frye was actively resisting them. Defendants argue that the videotapes (Exhibits E and F) in this case provide undisputed evidence that Defendant Lynn's tasering of Frye while Frye was handcuffed behind his back was objectively reasonable under the circumstances. Review of the videotapes shows that this is not correct. There is no genuine issue of material fact when a videotape firmly settles a material fact. *Smith v. Finkley,* 10 F.4[th] 725 (7th Cir. 2021) and *Horton v. Pobjecky,* 883 F.3d 941 (7th Cir. 2018). Where a plaintiff's account is utterly discredited by the videotape there is no genuine issue of material fact. *Scott v. Harris*, 550 U.S. 372 (2007); *Ferguson v. McDonough, supra,* and *Smith v. Finkley, supra.* But, as the Court in *Horton, supra*, noted, videos are sometimes unclear, incomplete, and fairly open to varying interpretations. When a videotape is ambiguous or not wholly clear it can only be relied on for those facts that can be established with confidence and beyond reasonable doubt. *Smith v. Finkley, supra.* The videotapes in this case not only do not utterly discredit Frye's deposition testimony that when Defendant Lynn

rushed at him, he did not lunge at Defendant Lynn, the video supports Frye's testimony that he braced himself for the assault. Exhibit E 1:54 – 1:59 and Exhibit F 2:59 – 2:57. Similarly, the videotapes do not utterly discredit Frye's testimony that he did not try to kick anyone but support his testimony that when he was shoved into the back of the police vehicle by Defendant Pettit, Frye was off balance and was trying to keep his balance. Exhibit F 2:52 – 3:04

The undisputed facts that the videotapes show is that Frye exited a police vehicle in the Logan County Jail without incident and that Fye was handcuffed behind his back. Exhibit E 1:12 – 1:18 Exhibit F 1:53 – 2:07. The videotapes show that Corrections Officer Neitzel was attempting to take Frye's temperature using a handheld thermometer device. Exhibit E 1:18 – 1:42 and Exhibit F 2:12 – 2:37. After a few attempts Corrections Officers Neitzel and Dunovsky just stood by watching Frye. The corrections officers appear to be in control, safe, and not attempting to use force with Frye. Exhibit E 1;42 – 1; 53 and Exhibit F2:37 – 2:47. However, the videotapes show that shortly after Defendant Lynn arrived at the salley port, Defendant Lynn put on examining gloves. Exhibit F 2:06 –2:19. Shortly thereafter, Defendant Lynn rushed toward Corrections Officer Neitzel and grabbed the handheld thermometer device from Corrections Officer Neitzel's hand and rushed toward Frye. Exhibit E 1:53 – 1:55 and Exhibit F 2:46 – 2:49. As indicated above, the videotapes show Frye being shoved into the back seat of a police vehicle with Defendant Pettit on top of Frye. Exhibit F 2:52 – 3:00. Very shortly thereafter, Frye is then tasered in his back by Defendant Lynn. Exhibit F 2:56 – 2:58. At a minimum, viewing the videotapes in a light most favorable to Frye, the videotapes raise disputed issues of material fact.

The testimony in this case "adds meat to the bones" of the videotapes and also demonstrates that there are disputed issues of material fact. If Defendant Lynn and Pettit's testimony is to be believed, Frye was aggressively attempting to injure them when he was handcuffed behind his

back in the salley port. Lynn and Pettit's version of what happened is contradicted by the videotape as demonstrated above and by the testimony of Frye and Corrections Officer Neitzel compelling the conclusion that there are disputed material facts in this case.

The testimony supports the conclusion that Frye was not a threat to any law enforcement official in the salley port at the time of the incident. Any possible threat, which Frye denies, occurred only after Defendant Lynn without any real justification went after Frye. Frye testified that he believed that Defendant Lynn had a vendetta against him. Exhibit B p. 22. This testimony is consistent with Defendant Lynn's behavior in the salley port. Shortly after arriving in the salley port, Defendant Lynn put on examining gloves. Why would Defendant Lynn put on examining gloves unless he expected a physical altercation.[3]

Once Defendant Lynn had the examining gloves on, he rushed toward Corrections Officer Neitzel and grabbed the handheld thermometer from Corrections Officer Neitzel's hand stating, "Give me the damn thing." Exhibit D, p.16. Corrections Officer Neitzel did not ask Defendant Lynn for assistance in taking Frye's temperature, nor did he give Defendant Lynn permission to take the thermometer. Exhibit D, p. 17. Defendant Lynn admitted that he did not ask Corrections Officer Neitzel if he could take the thermometer. Exhibit A, pp. 56 – 57. Corrections Officer Neitzel, who was only a few feet from Frye testified that he did not feel threatened by Frye at any time in the salley port. Exhibit D, pp 25 - 27. Defendant Lynn, in his testimony, corroborated that Frye was not a threat when he stated that he did not believe that Frye was a threat to the corrections officers. Exhibit A, p. 55. The lack of a threat by Frye is evident by the videotape which

---

[3] Defendant Pettit testified that Frye said words to the effect of: "You better put on gloves big boy, I've been wanting a piece of you." Exhibit C, p. 42. However, Frye denies making any threats in the salley port Exhibit B, p. 39 and Corrections Officer Neitzel did not hear Frye make any threats in the salley port. Exhibit D, p.44. Defendant Pettit's statement like much of his testimony is not supported by any evidence other than his own self-serving statements.

corroborates the fact that all of the law enforcement officers in the salley port were just standing around, Exhibit A, pp. 55 –56 and 68 - 69, and Exhibit C, p. 52, except for Defendant Lynn.

Once Frye was cornered, he braced himself for Defendant Lynn's attack. Exhibit B, pp. 44, 65, 68 and 70. Defendant Lynn stated that Frye got in a fighting stance, Exhibit A, p. 67, raised up on his toes, Exhibit A, p. 68, and would have headbutted Defendant Lynn if Defendant Pettit had not shoved Frye into the back seat of the police vehicle. Exhibit A, p. 76. Defendant Pettit testified almost exactly the same as Defendant Lynn except that he said that Frye lunged two times, Exhibit C, p. 45, and that he could not tell whether Frye was trying to head butt him, Defendant Lynn, or one of the Corrections Officers. Exhibit C, p. 43. Frye denies lunging at anyone, Exhibit B, pp. 56 and 71, and denies trying to headbutt anyone. *Id*. Corrections Officer Neitzel testified that while he indicated in his report that Frye lunged, Frye could have been bracing himself rather than lunging. Exhibit D, p. 17. Corrections Officer Neitzel's testimony is unequivocal that he did not see Frye attempt to headbutt anyone. Exhibit D, pp. 24 - 25. The jury needs to decide whether Frye was a threat or Lynn was a bully trying to show Frye who was boss. Credibility is a jury question and for purposes of summary judgment, there is a fact question. Exhibit D, p. 24.

The defendants also try to justify tasering Frye once Frye had been shoved into the police vehicle by claiming that Frye was an immediate threat to the officers' safety. As demonstrated by the videotapes and further supported by the testimony this is simply trying to manufacture a justification for force which never should have been used. The serious threat posed by Frye was that he was allegedly trying to kick Defendants Lynn and Pettit while he was being shoved into the back seat of the police vehicle. Interpreting the evidence in a light most favorable to Frye there is no undisputed evidence to support this contention. Even Defendant Lynn's own testimony shows the disputed nature of the facts. Defendant Lynn testified when Defendant Pettit shoved

Frye into the back seat of the police vehicle it appeared as if Frye was trying to keep his balance as he was falling backward. Exhibit A, p. 71.   According to Defendant Lynn, Frye's legs were backpedaling and kicking. Exhibit A, pp. 70 – 71.  As Frye was falling backward, Defendant Lynn drew his taser to taser Frye. Exhibit A, p. 71.  Defendant Lynn testified that he drew his taser to prevent injury to himself and the other officers in the salley port. Exhibit A, p. 75.  Defendant Lynn admitted that he did not warn anyone that he was about to discharge his Taser. Exhibit A, p, 72.

Testimony from Frye and Corrections Officer Neitzel contradicts the Defendants' testimony.  Frye testified that he never tried to kick anyone Exhibit B, pp, 64 and 71.  This is corroborated by the testimony of Corrections Officer Neitzel. Exhibit D. p. 47.  Ryan Frye told the Defendants that he was not resisting. Exhibit B, p. 45.  Corrections Officer Neitzel, was very close to Frye when Frye was tasered. Exhibit D, p. 23.  He had grabbed Frye's hand and his hand was inches away from where the taser went into Frye and he saw the taser probes go into Frye's back. Exhibit D, pp. 22 – 24.  Corrections Officer Neitzel described Frye as face down in the police vehicle with his feet outside the vehicle. Exhibit D, pp. 21 and 28.   Corrections Officer Neitzel testified that Defendant Pettit took physical control of Frye. Exhibit D, p. 45.   He testified that Frye was doing nothing but squirming for 10 – 15 seconds before he was tasered. Exhibit D, p. 22.

Defendants' conduct was not objectively reasonable. The Constitution prohibits the infliction of gratuitous pain and injury as a means to coerce compliance. *Amnesty Am. V. Town of W. Hartford*, 361 F.3d 113 (2d Cir. 2004).   A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that standing alone justifies the use of force that may cause serious injury. *Abbott v. Sangamon Cnty, supra*.   Simple disobedience to police commands is not a justification to taser a suspect. *See, Abbott v. Sangamon Cnty, supra*.  Aside

from punishment, a jury could reasonably conclude that Frye was tasered to get him to comply with having his temperature taken. As noted above, Defendants seek to justify tasering Frye because of the threat that he posed to the law enforcement officials in the salley port that night. The evidence with respect to the threat posed by Frye in the salley port that night is disputed. This is not a case where an officer had to make a split-second decision under intense, dangerous, uncertain and rapidly changing circumstances. *See, Graham, supra*. This was not a short term, high stress situation. There were five law enforcement officers in the salley port with Frye. Frye was handcuffed behind his back, Exhibit C. p. 58 and Exhibit D. p.18, and had no access whatsoever to a weapon. Exhibit C. p. 58. Frye was passively resisting having his temperature taken. The situation was relatively calm until Defendant Lynn rushed at Frye.

There was no need to force Frye to have his temperature taken in the salley port as Corrections Officer Neitzel testified that if Frye continued to refuse to have his temperature taken, he would have been transported to a local hospital emergency room and had his temperature taken there. Taken in a light most favorable to Frye, the actions by Defendant Lynn were just part of the continuing vendetta against Frye by Defendant Lynn.

Similarly, taken in a light most favorable to Frye, there is a factual dispute concerning whether to a reasonable officer on the scene, Frye posed an immediate threat to Defendant Lynn or any other law enforcement officer on the scene. The videos support Frye's testimony that Frye was just trying to brace himself as Defendant Lynn rushed at him and that Frye was just falling backward and trying to regain his balance as he was being shoved into the police vehicle. The videos certainly do not resolve the factual positions posited by Defendants.

The testimony also refutes Defendants' claim of no factual dispute. Frye's denial concerning acting in an aggressive manner is to a large extent supported by Corrections Officer

Neitzel, perhaps the only disinterested witness in the salley port that night. Corrections Officer Neitzel was equivocal about whether Frye lunged or was trying to brace himself. Corrections Officer Neitzel was unequivocal about the fact that Frye did not try to head butt anyone, that Frye did not threaten anyone, that Frye was not aggressive toward the Corrections Officers, that Frye was doing nothing more than squirming when he was in the police vehicle and that Defendant Pettit had physical control over Frye after he had shoved Frye into the police vehicle. No one, not even Defendant Lynn, except Defendant Pettit[4], claimed that Defendant Lynn warned Frye before he tased him. The evidence can support the conclusion that Frye was tased by Defendant Lynn to punish Frye or, viewed in Lynn's favor, to compel Frye to comply with having his temperature taken which is illegal.

Defendants' subjective perception that Frye was aggressive and presented a threat to officers in the salley port is not sufficient to support granting a motion for summary judgment. The standard is not the Defendants' subjective perceptions, but what would an objectively reasonable officer have perceived. Defendants attempt to bolster their subjective perception that Frye was an immediate threat by resorting to Frye's alleged reputation and his conduct when he was arrested.[5] Defendants' attempts are unavailing as the Courts have indicated that the prohibition against using significant force on a subdued suspect applies notwithstanding the suspect's previous behavior, including resisting arrest, threatening an officer's safety or even potentially carrying a weapon. *Smith v. Finkley, supra*, and *Alicea v. Thomas, supra*. Moreover,

---

[4] Defendant Pettit's testimony concerning this and other circumstances in the salley port is so inconsistent with the other witnesses that his entire testimony can be considered incredible.
[5] Defendants try to show that Frye was resisting arrest because he was walking slowly toward the police vehicle after he was arrested and handcuffed. There was no testimony that Frye resisted being handcuffed. There was undisputed testimony that Frye was walking in bare feet in an area that resembled a construction site. Exhibit B, pp. 29 – 30. Thus, it could be reasonable for Frye to walk slowly and stop frequently.

if Frye was earlier considered such a threat, why did Defendant Pettit by himself without any other officer transport Frye to the Logan County Jail.

In addition to scrutinizing the conduct of the suspect and the police officers, courts may also consider other factors to determine whether the perception of a threat was objectively reasonable. Did the suspect have access to a weapon? *Cyrus v. Town of Mukwonago, supra.* How many law enforcement officials were present at the scene? *Alicea v. Thomas, supra.*. Do statements made by law enforcement officials at the scene indicate that the use of force was for punishment rather than to deal with a perceived threat? *See Alicea v. Thomas, supra.*

Courts have required clear evidence of a perceived threat by a suspect to support a grant of a motion for summary judgment. *See e.g. Cyrus v. Town of Mukwonago, supra* (perceived threat of suspect who was lying on the ground with his hands under his body who refused to release arms for handcuffing perhaps because he could not as he was previously tasered was a question for the jury); *Kelly v. Vill. Of Lemont,* 2021 U.S. Dist. LEXIS 225853 (N.D. Ill. 2021) (perceived threat to officers where suspect apparently having a seizure was handcuffed and lying on ground struggling, including grabbing a police dog, after told not to struggle was issue to be decided by the jury) and *Yarnell v. Mendez,* 509 F. Supp. 2d 421 (D. Del. 2007) (reasonableness of tasering suspect who appeared to be trying to rise up against police officer's attempt to restrain the suspect on the hood of a police car, where the officer appeared to be sweating profusely and out of breath was issue for the jury).

### 2. Defendants are not Entitled to Immunity as Ryan Frye Had A Clearly Established Right Not To Be Tasered

The second prong in the analysis to determine whether defendants may be held liable is whether the constitutional right at issue was clearly established at the time the alleged violation occurred. *District of Columbia v. Wesb*y, 583 U.S. ___, 138 S.Ct. 577 (2018). Defendants are

entitled to qualified immunity where clearly established law does not show that they violated the Fourteenth Amendment. *Peterson v. Callahan*, 555 U.S. 223 (2009). The objective reasonableness of the Defendants' actions is assessed in light of the legal rules that were clearly established at the time the action was taken. *Peterson v. Callahan, supra*. A right is clearly established only if it has been defined with specificity. *Emmons v. City of Escondido,* 586 U.S. ___, 139 S.Ct. 500 (2019). The Court in *Weiland v. Loomis*, 938 F 3d 917 (7th Cir. 2019) indicated that a search for identical facts is not required and that a principle can be clearly established without matching a later case's facts. The search is for an appropriate level of generality not the most particular level. The level of generality is appropriate when it establishes the rule in a way that tells a public employee what the Constitution requires in the situation that the employee faces. *Weiland v. Loomis, supra.* A constitutional right is clearly established if the right in question is sufficiently clear that a reasonable officer should know that what he is doing violates that right. *Smith v. Finkley,* 10 F2d 4th 725 (7th Cir. 2021) (quoting *Weinmann v. McClone*, 787 F.3d 4444 (7th Cir. 2015).

The Court in *Abbott v. Sangamon Cnty,* 705 F. 3d 706 (7th Cir. 2013) provides an excellent explanation of where the Taser falls on the spectrum of force. The Court indicated that the Taser, although classified as non-lethal force, used in the "dart mode" causes the tasered individual to experience an excruciating pain that radiates throughout the body and inflicts a painful and frightening blow that temporarily paralyzes the individual. The Court in *Abbott,* indicated that the Taser used in the "dart mode" is an intermediate, though not insignificant quantum of force. The Court concluded that when used in the "dart mode," the Taser intrudes upon the victim's physiological functions and physical integrity in a way that other nonlethal uses of force do not. Thus, while nonlethal, the Taser is a significant use of force. The taser used against Frye was in "dart mode."

It is clearly established law that the use of a Taser on a subdued suspect can constitute excessive force. *Abbott v., Sangamon Cnty, supra,* and *Kelly v. Vill. of Lemont*, *supra*. No officer can use force against a suspect who is already handcuffed and not resisting arrest. *Buckley v. Haddock*, 292 F. App'x 791 (11th Cir. 2011). An officer may not use significant force like a taser against a non-resisting, or passively resisting subject. *Ferguson v. McDonough,* 13 F.4th 574 (7th Cir. 2021) and *Alicea v. Thomas, supra*. Permitting substantial escalation of force in response to passive noncompliance would be inappropriate with the courts' excessive force doctrine and would likely bring more injured citizens before the courts. *Alicea v. Thomas, supra*. It is thus clear, that the Constitution prohibits the use of a Taser against Frye considering the facts in a light most favorable to Frye. A reasonable officer at the time of this incident should have known that an officer's substantial escalation of force in response to an individual's passive resistance violated the individual's constitutional right. *Ferguson v. McDonough, supra*. Consequently, defendants are not entitled to qualified immunity.

### 3. State Law Battery Claims

Frye acknowledges that to prevail on a state law claim of battery it is not enough to show that the Defendants' conduct was not objectively reasonable, he must show that their conduct was willful and wanton. *Gill v. Village of Melrose Park*, 35 F.Supp.3d 956 (N.D. Ill. 2014. To be considered willful and wanton conduct must show an actual or deliberate intention to cause harm, or if not intentional, shows an utter indifference to or conscious disregard for the safety of others. *Gill v. Village of Melrose Park, supra*. Rather than reiterate in detail the evidence with respect to Frye's claim of excessive force, Frye will briefly state the evidence that supports his contention that the material evidence showing willful and wanton behavior is in dispute. Viewing the evidence in a light most favorable to Frye, the evidence shows that Defendant Lynn, who Frye

alleges engaged in a vendetta against him, without justification rushed toward Frye with a handheld thermometer, tasered Frye in the back when Frye was handcuffed behind his back, shoved Frye into the back seat of a police vehicle and while Frye was essentially defenseless. These facts show willful and wanton behavior by Defendant Lynn. Consequently, summary judgment should also be denied with respect to the state law battery claims.

### D. CONCLUSION

The evidence demonstrates that there are disputed issues of material fact concerning whether the Defendants' use of force was objectively reasonable under the circumstances and whether with respect to the state law battery claims, Defendants' conduct was willful and wanton. These issues must be resolved by a jury. Accordingly, summary judgment is not appropriate.

Plaintiff, RYAN FRYE,

By:     *s/ Jay L. Cohen*
Jay L. Cohen


James M. Kelly (ARDC# 6238519)
Jason W. Jording (ARDC# 6309358)
Jay L. Cohen (NY Bar# 1793074)
JAMES KELLY LAW FIRM
7817 N. Knoxville Avenue
Peoria, IL 61614
T:  (309) 679-0900
F:  (309) 679-0919
jim@jameskellylawfirm.com
jayc@jameskellylawfirm.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on June 21, 2023, I electronically filed the foregoing with the Clerk of the Court using the CMECF system which will send notification of such filing to the following:

Kaleah M. Ault
Charles E. Hervas
Hervas, Condon & Bersani, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156
kault@hcbattorneys.com
chervas@hcbattorneys.com

I certify that I have mailed by the United States Postal Service the document to the following non CMECF participants:

None.                                            By:   /s/Jay L. Cohen
                                                        Jay L. Cohen


James M. Kelly (ARDC# 6238519)
Jason W. Jording (ARDC# 6309358)
Jay L. Cohen (NY Bar# 1793074)
JAMES KELLY LAW FIRM
7817 N. Knoxville Avenue
Peoria, IL 61614
T:  (309) 679-0900
F:  (309) 679-0919
jim@jameskellylawfirm.com
jayc@jameskellylawfirm.com
*Attorneys for Plaintiff*