# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RYAN FRYE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-CV-1272 |
| | ) | |
| vs. | ) | |
| | ) | Judge Sara Darrow |
| CITY OF LINCOLN, a Municipal Corporation, | ) | |
| Lincoln Police Sgt. KEVIN LYNN, Individually | ) | Magistrate Judge Jonathan E. Hawley |
| and as Agent or Employee of City of Lincoln, | ) | |
| Lincoln Police Corporal SHAWN PETTIT, | ) | |
| Individually and as Agent or Employee of | ) | |
| City of Lincoln, Lincoln Police Chief | ) | |
| PAUL ADAMS, Individually and as Agent | ) | |
| or Employee of City of Lincoln, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants CITY OF LINCOLN, KEVIN LYNN, SHAWN PETTIT, and

PAUL ADAMS by and through their attorneys, CHARLES HERVAS and KALEAH AULT of

HERVAS, CONDON & BERSANI, P.C., and reply in support of their Motion for Summary

Judgment as follows:

### *Response to Plaintiff's Disputed Material Facts*

21.     Frye perceived a tension, and was upset and agitated (Ex. B, Frye Dep., pp. 22,

45; Ex. D, Neitzel Dep., pp. 13, 43-44). **DISPUTED in that that Frye perceived a tension**

**only with Defendant Lynn and was agitated. Exhibit B at pp. 22 and 37.**

**RESPONSE: Frye admits he perceived a tension and was upset and agitated.**

25.     Officers present when Frye was tased, including the Defendant Officers, knew

Frye to be someone who fought with law enforcement, had a history of violence, and was

directly threatening officers that night (Ex. A, Lynn Dep., pp. 30, 81; Ex. C, Pettit Dep., pp. 6-7; 53-56; Ex. D, Neitzel Dep., pp. 43, 46). **DISPUTED. Exhibit B p. 39, Exhibit C p. 7, Exhibit D pp. 18, 25 – 26 and 44. Testimony is that Frye can be aggressive with law enforcement, but there is no evidence that he fought with law enforcement. There is no need to admit or dispute footnote 3. As it is argument. Moreover, as it is argument, it should be stricken from Defendants' undisputed facts.**

**RESPONSE: Frye does not dispute he had a history of violence. Sgt. Lynn and Cpl. Pettit understood that Frye could fight with law enforcement and was a threat to them that evening (Ex. A, Lynn Dep., pp. 30, 81-82; Ex. C, Pettit Dep., pp. 43-44, 54-56).**

26.　　Frye exited Cpl. Pettit's squad car and immediately refused to cooperate with officers (Ex. E, Sally Port East Video, 00:57-01:51; Ex. F, Sally Port West Video, 01:49-02:45; Ex. A, Lynn Dep., pp. 53-55; Ex. B, Frye Dep., pp. 38-39; Ex. C, Pettit Dep., pp. 31-32; Ex. D, Neitzel Dep., pp. 9-12; 44-45). **DISPUTED to the extent that the statement implies that Frye did anything more than not answer COVID-19 screening questions and not have his temperature taken (Exhibit D pp. 11 – 12 and 25 – 27).**

**RESPONSE:  Frye admits that he did not answer the COVID-19 screening questions and refused to have his temperature taken. Furthermore, Frye immediately began arguing with officers upon exiting the squad car (Ex. C, Pettit Dep., pp. 31-32, 40).**

27.　　Frye knew he had to complete the screening questionnaire and have his temperature taken as part of the intake process and purposefully took action to prevent the officers from completing the intake questionnaire and taking his temperature (Ex. A, Lynn Dep., pp. 53-55; Ex. B, Frye Dep., pp. 36, 38-39; Ex. C, Pettit Dep., p. 32; Ex. D, Neitzel Dep., pp. 11, 16). **DISPUTED.**

**RESPONSE:** Frye improperly disputes paragraph 27 without providing a factual basis. ILCD Local Rule 7.1 (D)(2)(b); Fed. R. Civ. Pro. 56(e). Frye admitted in his testimony that he knew the screening questionnaire had to be completed as part of his intake process (Frye Dep., pp. 38-39). Frye admitted he purposefully refused to allow officers to take his temperature, thwarting their ability to complete the intake process (Frye Dep., pp. 36, 38-39).

28. When Officer Neitzel attempted to complete the intake screening, Frye refused to answer the questions and moved his head away from the forehead thermometer repeatedly (Ex. A, Lynn Dep., pp. 54-55; Ex. B, Frye Dep., pp. 46, 59, 61-62, 69; Ex. C, Pettit Dep., pp. 31-32; Ex. D, Neitzel Dep., pp. 11-12; Ex. E, Sally Port East Video, 01:15-01:53; Ex. F, Sally Port West Video, 02:05-02:45). **DISPUTED that Frye moved his head away from the forehead thermometer repeatedly. Exhibit D p.11, Exhibit E and Exhibit F.**

**RESPONSE:** Plaintiff's citation to Exhibit D p.11 is factually incorrect. On page 11 of Exhibit D Neitzel states specifically that Frye moved his head "out of the way like that" numerous times while Neitzel was trying to take Frye's temperature (Ex. D, Neitzel Dep., p. 11). Frye also admits that correctional officers tried to take his temperature on more than one occasion and stated that he backed his head away (Ex. B, Frye Dep., p. 46). Furthermore, the video exhibits also show Frye repeatedly refusing and physically resisting having his temperature taken (Ex. E, Sally Port East Video, 01:15-01:53; Ex. F, Sally Port West Video, 02:05-02:45).

29. After Officer Neitzel attempted to take Frye's temperature multiple times, but failed to do so, Sgt. Lynn came forward, took the thermometer from Neitzel's hand, and approached Frye (Ex. A, Lynn Dep., pp. 56-58; Ex. B, Frye Dep., pp. 37-38, Ex. D, Neitzel Dep., pp. 15-16; Ex. E, Sally Port East Video, 01:51-01:54; Ex. F, Sally Port West Video, 02:45-02:48). **DISPUTED in that Corrections Officer Neitzel attempted to take Frys's temperature more than once and that Defendant Lynn rushed toward Corrections Officer Neitzel and grabbed the thermometer out of Corrections Officer Neitzel's hand. Exhibit D pp 15, 16, 20 and 48.**

**RESPONSE:** Frye moved his head numerous times while Neitzel was trying to take Frye's temperature (Ex. D, Neitzel Dep., p. 11). Frye admits that correctional officers tried to take his temperature on more than one occasion and stated that he backed his head away (Ex. B, Frye Dep., p. 46). Furthermore, the video exhibits also show Frye repeatedly refusing and physically resisting having his temperature taken (Ex. E, Sally Port East Video, 01:15-01:53; Ex. F, Sally Port West Video, 02:05-02:45).

30.     As Sgt. Lynn approached Frye with the thermometer, Frye quickly moved towards Sgt. Lynn while bringing his shoulders and head forward, quickly moving his body closer to Sgt. Lynn (Ex. A, Lynn Dep., p. 56; Ex. B, Frye Dep., p. 70; Ex. C, Pettit Dep., pp. 43-46; Ex. D, Neitzel Dep., p. 17; Ex. E, Sally Port East Video, 01:53-01:55; Ex. F, Sally Port West Video, 02:46-02:50). **DISPUTED. Exhibit B pp. 56, 62, 65, 70 and 71. Exhibit D p. 17. Exhibit E time 1:53 – 1:57 and Exhibit F time 2:48 – 2:52.**

**RESPONSE:** Frye fails to specifically note what portions of paragraph 30 are disputed. Exhibit B does not assert that Frye made no movement, Frye's statements assert that his movement was to brace himself, or that he made a jerking or twisting movement (Ex. B, Frye Dep., pp. 56, 62, 65, 70). Plaintiff's citations to EXHIBIT E and EXHIBIT F are factually incorrect in that Plaintiff implies Frye did not make a movement towards Sgt. Lynn (Ex. D, Neitzel Dep., p. 17; Exhibit E time 1:53 – 1:57 and Exhibit F time 2:48 – 2:52).

31.     When Frye lunged aggressively at Sgt. Lynn, Cpl. Pettit feared that Frye would head butt Sgt. Lynn (Ex. C, Pettit Dep., pp. 43-44; 56-57). **DISPUTED that Frye lunged aggressively at Defendant Lynn. Exhibit B pp. 56, 62, 65, 70 and 71. Exhibit D pp. 17 and 24 - 25. Exhibit E time 1:53 – 1:57 and Exhibit F time 2:48 – 2:52.**

**RESPONSE:** In Ex. D at p. 17 CO Neitzel states that Frye "either trying to stable himself or lunge at" Sgt. Lynn. CO Neitzel provided that in his report he stated that Frye lunged at Sgt. Lynn (Ex. D, Neitzel Dep., p. 26). Any implication that Exhibits E and F at the given times do not show Frye aggressively moving towards Sgt. Lynn quickly is factually inaccurate.

32.    Cpl. Pettit was standing behind Frye. When Frye lunged forward aggressively towards Sgt. Lynn, Cpl. Pettit grabbed and shoved Frye into the backseat of the police vehicle to create a reactionary gap and move Frye away from the officers (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 44-46; Ex. E, Sally Port East Video, 01:53-01:57; Ex. F, Sally Port West Video, 02:48-02:52). **DISPUTED in that Defendant Pettit grabbed Frye in a choke hold and shoved him into the back seat of the police vehicle. Exhibit B pp 44 – 45, 63 and 70. Exhibit D PP. 28 – 29. Exhibit E time 1:53 – 1:57 and Exhibit F time 2:48 – 2:52.**

**RESPONSE:** **Undisputed in that Frye described and believes he was placed in a choke hold (Ex. B, Frye Dep., pp. 43-45, 63). The video evidence shows that Cpl. Pettit did not place Frye in a chokehold, however, Cpl. Pettit did grab and shove Frye into the backseat of the police vehicle (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 44-46; Ex. E, Sally Port East Video, 1:53-1:57; Ex. F, Sally Port West Video, 2:48-2:52).**

33.    Frye actively resisted Cpl. Pettit. During Frye's struggle with Cpl. Pettit, Sgt. Lynn removed his taser from his belt and tased Frye in the back one time, for one five-second taser cycle (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 63-64; Ex. E, Sally Port East Video, 01:55-02:00). **DISPUTED except that Defendant Lynn tasered Frye in the back. Exhibit B pp. 44- 45, 50 and 52. Exhibit D p.22. Exhibit E time 1:55 – 2:00.**

**RESPONSE:** **Frye improperly disputes paragraph 33 without providing a sufficient factual basis for his allegedly disputed fact. ILCD Local Rule 7.1(D)(2)(b); Fed. R. Civ. Pro. 56(e). No evidence suggests that Frye was tased more than once or for longer than one taser cycle.**

35.    Officers at the Lincoln Police Department, including Sgt. Lynn and Cpl. Pettit, are trained and certified in the use of tasers (Ex. A, Lynn Dep., pp. 10-13; Ex. C, Pettit Dep., pp. 62¬65; Ex. G, Adams Dep., pp. 11-12; 35-36). **DISPUTED as the training records of Defendant Lynn do not reflect any certification for Taser Training Plaintiff Exhibit 1**

and the training records of Defendant Pettit indicate that his last certification for Taser

Training was 2018. Plaintiff Exhibit 2.

**RESPONSE:** Plaintiff's allegations are factually incorrect. Within Exhibit 1, which Plaintiff has attached to their response, Sgt. Lynn's certification can be found on LINCOLN 000204. Additionally, Plaintiff incorrectly assumes that Cpl. Pettit's certification from 2018 is no longer valid.

36.      Officers at the Lincoln Police Department, including Sgt. Lynn and Cpl. Pettit,

are trained in the use of force (Ex. A, Lynn Dep., pp. 35-37; Ex. C, Pettit Dep., pp. 14, 17;

Ex. G, Adams Dep., pp. 9, 29-30, 33-34). DISPUTED.

**RESPONSE:** Frye improperly disputes paragraph 36 without providing a factual basis. ILCD Local Rule 7.1 (D)(2)(b); Fed. R. Civ. Pro. 56(e). Plaintiff provides absolutely no basis to dispute Defendants' statement, and there is no basis to dispute Defendants' statement. As a result, Plaintiff's dispute should be disregarded.

38.      Policy 300 of the Lincoln Police Department – Use of Force. Policy 300

covers the types, scope, and limitations on use of force (Ex. H, Policy 300). Officers are

trained on each policy (Ex. A, Lynn Dep., p. 38; Ex. C, Pettit Dep., pp. 13-14; Ex. G, Adams

Dep., pp. 28-30). **DISPUTED except that Policy 300 of the Lincoln Police Department –**

**Use of Force. Policy 300 covers the types, scope, and limitations on use of force.**

**RESPONSE:** Frye improperly disputes paragraph 38 without providing a factual basis. ILCD Local Rule 7.1 (D)(2)(b); Fed. R. Civ. Pro. 56(e). Plaintiff provides no basis to dispute that officers are trained on each policy, and there is no evidence to dispute that officers are trained on each policy. As a result, Plaintiff's dispute should be disregarded.

37.      The Lincoln Police Department utilizes the Lexipol system for additional

training, which includes daily training briefs (Ex. A, Lynn Dep., pp. 35-36; Ex. C, Pettit

Dep., pp. 14-15; Ex. G, Adams Dep., pp. 28, 30). **DISPUTED.**

**RESPONSE:** Frye improperly disputes paragraph 37 without providing a factual basis. ILCD Local Rule 7.1 (D)(2)(b); Fed. R. Civ. Pro. 56(e). Plaintiff provides

**absolutely no basis to dispute Defendants' statement, and there is no basis to dispute Defendants' statement. As a result, Plaintiff's dispute should be disregarded.**

39.     Policy 304 of the Lincoln Police Department – Electronic Control Devices.

Policy 304 regulates the use of tasers (Ex. I, Policy 304). Officers are trained on each policy

(Ex. G, Adams Dep., pp. 33-36). **DISPUTED except that Policy 304 of the Lincoln Police**

**Department – Electronic Control Devices. Policy 304 regulates the use of tasers.**

**RESPONSE:** **Frye improperly disputes paragraph 39 without providing a factual basis. ILCD Local Rule 7.1 (D)(2)(b); Fed. R. Civ. Pro. 56(e). Plaintiff provides absolutely no basis to dispute Defendants' statement, and there is no basis to dispute Defendants' statement. As a result, Plaintiff's dispute should be disregarded.**

### *Response to Plaintiff's Disputed Immaterial Facts*

7.     In the basement of 826 N. McLean, Sgt. Lynn made contact with Frye, who

was in handcuffs for officer safety and due to the nature of the call. Sgt. Lynn also met with

Officer Eimer, and identified Wendy Livingston, who was injured and lying on a mattress in

the basement (Ex. A, Lynn Dep., pp. 28-31). **This action involves excessive force on a pre-**

**trial detainee, not excessive force during an arrest. Therefore, the severity of the crime**

**is irrelevant. In any event, whether Livingston was lying on a mattress does not indicate**

**the severity of the crime. The statement is disputed also that the statement implies that**

**Livingston was lying on a mattress due to an injury, Exhibit A at p. 31 and Exhibit B at**

**p. 27.**

**RESPONSE:** **The severity of a Plaintiff's underlying crime is relevant to the Fourth Amendment analysis examining excessive force. *Graham v. Connor*, 490 U.S. 386, 396 (1989).**

10.     Frye was arrested for domestic battery and unlawful restraint, and he was

agitated and upset (Ex. A, Lynn Dep., pp. 30-31; Ex. B, Frye Dep., p. 22; Ex. C, Pettit Dep.,

p. 25). **What Frye was arrested for and whether he was agitated or upset when arrested is irrelevant to whether he was the victim of excessive force in the salley port of the Logan County jail. The statement is also disputed to the extent that Frye was agitated. Exhibit B at pp. 20 – 22.**

<u>RESPONSE:</u> The severity of a Plaintiff's underlying crime is relevant to the Fourth Amendment analysis examining excessive force, as is the arrestee's behavior during his arrest. *Graham v. Connor*, **490 U.S. 386, 396 (1989).**

11. While being escorted from the basement to Cpl. Pettit's squad vehicle, Frye repeatedly stopped, despite officers instructing Frye to continue moving (Ex. B, Frye Dep., pp. 29¬31; Ex. C, Pettit Dep., pp. 27-28). **Whether Frye repeatedly stopped while being escorted to the police vehicle is irrelevant to whether he was the victim of excessive force in the salley port of the Logan County jail. The statement is also disputed to the extent that this implies that Frye was resisting arrest. Exhibit B at pp. 29 – 31.**

<u>RESPONSE:</u> An arrestee's behavior during arrest is relevant to the Fourth Amendment analysis examining excessive force. *Graham v. Connor*, **490 U.S. 386, 396 (1989).**

*Response to Plaintiff's Undisputed Immaterial Facts*

6. In the early morning hours of September 27, 2020, multiple officers arrived at 826 N. McLean in response to a call made because Frye was committing domestic violence against his then girlfriend, Wendy Livingston (Ex. A, Lynn Dep., pp. 28, 30-31; Ex. B, Frye Dep., pp. 9, 13, 33; Ex. C, Pettit Dep., p. 23). **It is immaterial why the police were called to Frye's residence before he was arrested and transported to the Logan County jail where he was allegedly the victim of excessive force as a pre-trial detainee.**

<u>RESPONSE:</u> The severity of a Plaintiff's underlying crime is relevant to the Fourth Amendment analysis examining excessive force. *Graham v. Connor*, **490 U.S. 386, 396 (1989).**

8.      Ms. Livingston had a visible injury to her lip (Ex. A, Lynn Dep., p. 30).

**Whether Livingston had an injury to her lip is immaterial to the issue of whether Frye**

**was allegedly the victim of excessive force as a pre-trial detainee.**

**RESPONSE:** The severity of a Plaintiff's underlying crime is relevant to the Fourth
Amendment analysis examining excessive force. *Graham v. Connor*, 490
U.S. 386, 396 (1989).

12.      Frye refused to enter the squad vehicle immediately (Ex. B, Frye Dep., pp. 28-

29; Ex. C, Pettit Dep., p. 39). **It is immaterial whether Frye entered a police vehicle**

**immediately when he was arrested considering that this action involves excessive force**

**against a pre-trial detainee. In addition, whether Frye entered the police vehicle**

**immediately has no relevance considering the time that elapsed between entering the**

**police vehicle and the alleged excessive force that occurred in the salley port of the jail.**

**RESPONSE:** Under the law, the Fourth not Fourteenth Amendment applies,
furthermore, an arrestee's behavior during arrest is relevant to the
Fourth Amendment analysis examining excessive force. *Graham v. Connor*,
490 U.S. 386, 396 (1989).

14.      Frye ultimately pleaded guilty to domestic violence and was sentenced to five

years of incarceration (Ex. B, Frye Dep., pp. 12-13). **What offense Frye pleaded guilty to**

**and the sentence is irrelevant to whether he was the victim of excessive force in the**

**salley port of the Logan County jail.**

**RESPONSE:** The severity of a Plaintiff's underlying crime is relevant to the Fourth
Amendment analysis examining excessive force. *Graham v. Connor*, 490
U.S. 386, 396 (1989).

16.      The jail significantly limited accepting custody of arrestees, however,

domestic violence perpetrators were still accepted by the jail (Ex. D, Neitzel Dep., pp. 38-

39). **Whether the Logan County jail significantly limited accepting custody of arrestees,**

but admitted alleged perpetrators of domestic violence is irrelevant to whether Frye was the victim of excessive force in the salley port of the Logan County jail.

**RESPONSE:** At the time of these events the COVID pandemic was at a peak, and the procedures that were in place due to the pandemic were understood yet disregarded by the Plaintiff. As a result, the circumstances under which the Logan County Jail was accepting and processing inmates is relevant to Plaintiff's claims.

23. Frye was known within the department due to his number of arrests. Frye was approximately 10 years old when he had his first interaction with Sgt. Lynn. Sgt. Lynn was aware that most of Frye's incidents involved batteries, assaults, or attempted batteries (Ex. A, Lynn Dep., pp. 23-25; 27; Ex. B [sic], Frye Dep., p. 12). **Whether Frye's first encounter with Defendant Lynn was when he was 10 years old is irrelevant as is whether Defendant Lynn was aware but not involved in Plaintiff's prior incidents which allegedly involved batteries, assaults or attempted batteries is irrelevant to the issue whether Frye was the victim of excessive force in the salley port of the Logan County jail.**

**RESPONSE:** While Plaintiff's beliefs or intent are irrelevant to Plaintiff's claims, a reasonable officer's beliefs and knowledge during the given situation are relevant. As a result, what Sgt. Lynn knew at the time of these events regarding Plaintiff is relevant. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

24. Due to previous convictions for crimes such as aggravated battery, domestic battery, and criminal damage to property, Frye had previously been incarcerated at the Logan County Jail four times (Ex. B [sic], Frye Dep., p. 12). **Whether Frye was previously incarcerated four times in the Logan County jail for aggravated battery, domestic battery and criminal damage to property is irrelevant to whether he was a victim of excessive force in the salley port of the Logan County jail.**

**RESPONSE:** **While Plaintiff's beliefs or intent are irrelevant to Plaintiff's claims, a reasonable officer's beliefs and knowledge during the given situation are relevant. As a result, what the officers on scene knew at the time of these events regarding Plaintiff is relevant.** *Graham v. Connor*, **490 U.S. 386, 396-97 (1989).**

34. After Frye was tased, his temperature was taken, and the rest of the booking process was completed (Ex. A, Lynn Dep., p. 84; Ex. D, Neitzel Dep., pp. 13-14). **What occurred after Frye was tasered is irrelevant.**

**RESPONSE:** **The totality of the circumstances are to be considered during a Fourth Amendment excessive force analysis. Including what was likely to happen had officers not used the force they employed. As a result, Plaintiff's actions directly after the alleged excessive force are relevant in considering the totality of the circumstances and Plaintiff's actions.**

### *Response to Plaintiff's Additional Material Facts*

1. Frye was harassed on a number of occasions by Defendant Lynn before the night of the incident. Exhibit B, pp. 22 -24.

**RESPONSE:** **Irrelevant. While the knowledge that would have been available to a reasonable officer during the events is relevant, Plaintiff's thoughts or framing of previous incidents with law enforcement are not relevant.** *Graham v. Connor*, **490 U.S. 386, 396-97 (1989).**

2. Due to the previous harassment, Frye felt that Defendant Lynn had a vendetta against Plaintiff. Exhibit B, p. 22.

**RESPONSE:** **Irrelevant, while the knowledge that would have been available to a reasonable officer during the events is relevant, Plaintiff's thoughts are irrelevant to a Fourth Amendment excessive force analysis.** *Graham v. Connor*, **490 U.S. 386, 396-97 (1989).**

3. Defendant Lynn was the Lincoln Police Department officer in charge of the arrest of Frye on the night of the incident. Exhibit C, p. 26.

**RESPONSE:** **Disputed. Plaintiff correctly cites that Sgt. Lynn was in charge of the scene (Ex. C, Pettit Dep., p. 26). However, while Sgt. Lynn stated "we've got [a] domestic battery charge, [or] something to that effect," it was Officer Eimer who spoke with and arrested Frye (Ex. A, Lynn Dep., pp. 30-31).**

4.     Defendant Pettitt is 5'10" tall and weighs 250 pounds. Exhibit C, p. 11.

**RESPONSE: Undisputed.**

5.     Frye was transported to the Logan County Jail in a police vehicle by Defendant Pettit by himself without any other law enforcement officers in the vehicle. Exhibit C, p. 29.

**RESPONSE: Undisputed and irrelevant to a Fourth Amendment excessive force analysis.**

6.     Frye willingly got out of the police vehicle when it was in the salley port of the Logan County jail. Exhibit C, p. 31. Exhibit E 1:12 - 1:18; Exhibit F 1:53 – 2:07.

**RESPONSE: Undisputed.**

7.     Frye was handcuffed behind his back the entire time he was in the salley port of the Logan County jail. Exhibit D, p. 18.

**RESPONSE: Undisputed.**

8.     Officer Ian Neitzel is a corrections officer at the Logan County jail and was on duty on September 27, 2020, the night of the alleged excessive force suffered by Frye. Exhibit D, p. 11.

**RESPONSE: Undisputed.**

9.     Other law enforcement officials present when the alleged excessive force occurred were Corrections Officers Neitzel and Robert Dunovsky, Logan County Deputy Phillips, and Lincoln Police Officers, Defendants Lynn and Pettit. Exhibit D, pp. 14 – 15.

**RESPONSE: Undisputed, already provided in Def. SOF, ¶ 22.**

10.     Frye wanted to speak to a Corrections Officer supervisor. Exhibit B, pp. 36 and 68.

**RESPONSE: Irrelevant. Wanting to speak to a supervisor neither gave Frye a right to resist officers nor is it relevant to an excessive force analysis.**

11.     Frye wanted to talk to a supervisor as soon as possible. Exhibit B, pp. 39 and 62.

**RESPONSE:** **Irrelevant. Wanting to speak to a supervisor neither gave Frye a right to resist officers nor is it relevant to an excessive force analysis.**

12. Frye wanted to speak to a supervisor because he was afraid of Defendant Lynn and he wanted to insure that nothing happened. Exhibit B, pp. 37 and 60 - 62.

**RESPONSE:** **Irrelevant. Wanting to speak to a supervisor neither gave Frye a right to resist officers nor is it relevant to an excessive force analysis.**

13. The Corrections Officers backed off and asked Frye what was wrong. Exhibit D, p. 38.

**RESPONSE:** **Undisputed.**

14. Frye did not have time to explain his concerns before Defendant Lynn arrived at the salley port. Exhibit B, pp. 37 – 38.

**RESPONSE:** **Irrelevant to an excessive force analysis.**

15. It was the Corrections Officers' responsibility to perform the COVID screening for the jail. Exhibit C, p. 61 and Exhibit D, p. 16.

**RESPONSE:** **Disputed as far as it implies the correctional officers are the only ones able to perform the COVID screening procedures or that the Logan County Jail has custody of an individual prior to the individual completing the COVID screening procedures (Ex. A, Lynn Dep., p. 59; Ex. D, Neitzel Dep., pp. 40-42).**

16. If the COVID screening was not performed at the Logan County jail, it would have been performed in a hospital emergency room. Exhibit D, p. 42.

**RESPONSE:** **Irrelevant and an incomplete description of Correctional Officer Neitzel's testimony. CO Neitzel explained that if the arrestee could not be screened at the jail they would be transported to the hospital for screening. However, the arrestee would still have to cooperate with the hospital in order to complete the screening procedures, before being transferred back to the jail by local police, and booked (Ex. D., Neitzel Dep., p. 41).**

17. Frye was not acting aggressively toward Corrections officer Neitzel. Exhibit D, pp. 25 – 26. Exhibit E 1:18 – 1;53 and Exhibit F 2:12 – 2:46.

**RESPONSE:** **Undisputed only in that CO Neitzel states that Frye did not approach him aggressively (Ex. D, Neitzel Dep., p. 25). Disputed in that it implies Frye was cooperating, which Neitzel specifically states he was not, or was not behaving aggressively (Ex. A, Lynn Dep., pp. 54-58; Ex. B, Frye Dep., pp. 37-38, 70; Ex. C, Pettit Dep., pp. 43-46; 55-56; Ex. D, Neitzel Dep., pp. 11-12, 25; Ex. E, Sally Port East Video, 1:53-1:55; Ex. F, Sally Port West Video, 2:46-2:50).**

18.     Corrections Officer Neitzel did not feel physically threatened by Frye. Exhibit D, p. 27.

**RESPONSE:** **Undisputed.**

19.     Frye did not act aggressively toward anyone while he was in the salley port.

Exhibit B, pp. 39 – 40 and Exhibit E 1:16 – 12:15: Exhibit F 1:53 – 13:10.

**RESPONSE:** **Disputed in that Frye argued with, physically resisted, and threatened officers in the sally port of the Logan County Jail (Def.'s SOF ¶¶ 26-33; Ex. E, Sally Port East Video, 1:15-1:55; Ex. F, Sally Port West Video, 2:05-2:50).**

20.     Frye did not threaten anyone while Plaintiff was in the salley port. Exhibit B, pp.

39, 47 – 48 and 56. Exhibit D, p. 44.

**RESPONSE:** **Exhibits E & F show Frye physically threatening Sgt. Lynn (Ex. E, Sally Port East Video, 1:53-2:00; Ex. F, Sally Port West Video, 2:46-2:52). Furthermore, Sgt. Lynn, Cpl. Pettit, and CO Neitzel provide that Frye verbally threatened officers in the sally port (Ex. A, Lynn Dep., p. 81-82; Ex. C, Pettit, Dep., 43-44, 55-56).**

21.     Defendant Lynn entered the salley port after all other law enforcement personnel

were already in the salley port. Exhibit B, p. 36 and Exhibit F 1:47

**RESPONSE:** **Undisputed and irrelevant to an excessive force analysis.**

22.     Defendant Lynn grabbed the thermometer from Corrections Officer Neitzel's

hand while saying "Give me the damn thing." Exhibit D, pp. 15 -16 and Exhibit E 1:53 – 1;54:

Exhibit F 2:46 – 2:49.

**RESPONSE:** **Undisputed in that Sgt. Lynn took the thermometer from CO Neitzel. CO Neitzel's testimony is that Sgt. Lynn stated "[g]ive me the damn thing," while taking the thermometer from CO Neitzel's hand. CO Neitzel did not attempt to stop Sgt. Lynn from taking the thermometer (Ex. D., Neitzel Dep., pp. 11, 15-16, 47).**

23. Corrections Officer Neitzel did not indicate that Defendant Lynn could take the thermometer. Exhibit D, p. 16.

**RESPONSE: Irrelevant to a Fourth Amendment excessive force claim.**

24. After taking the thermometer, Defendant Lynn rushed at Frye. Exhibit D, p. 20 and Exhibit E 1:54 – 1:55.

**RESPONSE: Undisputed in that after Sgt. Lynn received the thermometer from CO Neitzel he moved towards Frye quickly (Ex. A, Lynn Dep., pp. 56-58; Ex. B, Frye Dep., pp. 37-38; Ex. D, Neitzel Dep., pp. 15-16; Ex. E, Sally Port East Video, 1:51-1:54; Ex. F, Sally Port West Video, 2:45-2:48).**

25. When Defendant Lynn rushed toward Frye, Defendant Pettit was about one foot from Frye, Corrections Officer Neitzel was about two feet from Frye, and Frye was about one foot from the police vehicle. Exhibit D, pp. 17 and 19.

**RESPONSE: Undisputed in that after Sgt. Lynn took the thermometer from CO Neitzel he moved towards Frye quickly and at that time Neitzel describes their positioning as such (Ex. A, Lynn Dep., pp. 56-58; Ex. D, Neitzel Dep., pp. 15-17, 19; Ex. E, Sally Port East Video, 1:51-1:54; Ex. F, Sally Port West Video, 2:45-2:48).**

26. When Defendant Lynn rushed toward Frye, Frye did not know what Defendant Lynn was going to do and felt physically threatened. Exhibit B, pp. 45 – 46 and 47.

**RESPONSE: Irrelevant. Frye's thoughts are not to be considered in a Fourth Amendment, or Fourteenth Amendment, excessive force analysis.**

27. Frye was in a corner with the car door behind him and had to brace himself. He could not back up, so he balled up because he had no defense. Exhibit B, pp. 44, 65, 68 and 70.

**RESPONSE: Irrelevant and factually untrue as it focuses on Frye's internal monologue which is irrelevant to the claims in this case. Further, Frye's actions of "brac[ing]" himself or "ball[ing] up," are inconsistent with the video evidence (Ex. E, Sally Port East Video, 1:53-1:55; Ex. F, Sally Port West Video, 2:46-2:50).**

28. Frye did not lunge at or try to charge Defendant Lynn when Defendant Lynn rushed at him. Exhibit B, pp. 56 and 71 and Exhibit E 1:54 – 1:57.

**RESPONSE:** **Disputed in that Frye aggressively moved towards Sgt. Lynn when Sgt. Lynn approached Frye with the thermometer (Ex. A, Lynn Dep., p. 56; Ex. B, Frye Dep., pp. 69-70; Ex. C, Pettit Dep., pp. 43-46; Ex. D, Neitzel Dep., p. 17; Ex. E, Sally Port East Video, 1:53-1:55; Ex. F, Sally Port West Video, 2:46-2:50).**

29. Frye did not try to head butt anyone. Exhibit D, pp. 24 – 25 and Exhibit E 1:54 – 2:01; Exhibit F 2:44 – 2:59.

**RESPONSE:** **Disputed in that other officers perceived Frye as attempting to headbutt officers (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 43-44; 56-57).**

30. When Frye went to crouch down, Defendant Pettit grabbed Frye's head or shoulders and put Frye in what felt like a "choke hold" but did not lock the hold. Exhibit B, pp. 44 - 45, 63 and 70 and Exhibit E 1:57 – 1:59; Exhibit F 2:49 – 2:52.

**RESPONSE:** **Disputed in that Frye was not placed in a choke hold. Undisputed in that when Frye lunged towards Sgt. Lynn, Cpl. Pettit grabbed and shoved Frye into the backseat of the police vehicle (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 44-46).**

31. Frye was then shoved into the back seat of the police vehicle. Exhibit D, pp. 28 – 29 and Exhibit F 2:52 – 2:54.

**RESPONSE:** **Undisputed.**

32. As Frye was shoved into the back seat of the police vehicle, he was off balance and appeared to try to keep his balance as he was falling backward. Exhibit A, p. 71 and Exhibit E 2:07 – 2:09; Exhibit F 2:54 – 3:00.

**RESPONSE:** **Disputed in that the statement implies Frye did not engage in a struggle with officers after lunging at Sgt. Lynn and having Cpl. Pettit attempt to gain physical control over Frye (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 44-46; Ex. E, Sally Port East Video, 01:55-02:00).**

33. Frye was face down in the vehicle with his feet outside the vehicle and Defendant Pettit holding him. Exhibit B, pp. 65 -66, Exhibit D, p. 21.

**RESPONSE:** **Disputed because Plaintiff provides no context for the time period at which this fact allegedly occurred. At some points Frye was upright in the vehicle when struggling with officers and at another point he was facedown, Cpl.**

**Pettit did attempt to gain physical control over Frye (Ex. A, Lynn Dep., p. 83; Ex. C, Pettit Dep., pp. 44-46).**

34.    Defendant Pettit had physical control of Frye. Exhibit D, p. 45.

**RESPONSE:    Disputed because Plaintiff provides no context for the time period at which this fact allegedly occurred. Further, Cpl. Pettit specifically provides that as the events were occurring Frye "was not under control . . . . I didn't have control of him[ ]" (Ex. D, Pettit Dep., p. 48).**

35.    Frye did not kick anyone. Exhibit D, p. 47 and Exhibit F 2:52 – 3:04.

**RESPONSE:    Undisputed in that Frye did not successfully kick the officers in the sally port while resisting them. However, Frye tried to kick at the officers (Ex. A, Lynn Dep., pp. 82-84; Ex. C, Pettit Dep., pp. 47-48; 57).**

36.    Frye told the Defendants that he was not resisting. Exhibit B, p. 45.

**RESPONSE:    Undisputed that Frye made statements he was not resisting.**

37.    Frye was then tasered. Exhibit D, pp. 20 and 22 and Exhibit F 2:56 – 2:58.

**RESPONSE:    Undisputed that Frye was tased once after struggling with officers.**

38.    Defendant Lynn did not give any warning before he tasered Frye. Exhibit A, p. 72 and Exhibit D, p. 24.

**RESPONSE:    Undisputed in that Sgt. Lynn stated that he did not give a warning to Frye that he was going to tase Frye, and that CO Neitzel does not recall Sgt. Lynn giving Frye a warning (Ex. A, Lynn Dep., p. 72; Ex. D, Neitzel Dep., p. 24).**

39.    When Frye was tasered by Defendant Lynn, Frye was chest down in the police vehicle with his feet on the ground. Exhibit D. p. 25 and Exhibit F 2:56 – 2:58.

**RESPONSE:    Disputed. At the time Frye was tased he was struggling with officers (Ex. A, Lynn Dep., p. 56; Ex. C, Pettit Dep., pp. 44-46, 48-49; Ex. E, Sally Port East Video, 01:55-02:00).**

40.    Frye was tasered in the back just above his handcuffs. Exhibit D, p. 20.

**RESPONSE:    Undisputed in that Frye was tased once in the back near his handcuffs.**

41.    Before Frye was tasered, Corrections Officer Neitzel had grabbed one of Frye's hands. Exhibit D, pp. 22 – 23.

**RESPONSE:** **Disputed in that CO Neitzel states that his focus was on Frye's "hand and handcuffs and grabbing his hand," however, there is no evidence CO Neitzel had successfully grabbed one of Frye's hands (Ex. D, Neitzel Dep., pp. 22-23; Ex. E, Sally Port East Video, 01:55-02:08).**

42. Corrections Officer Neitzel's hand was inches away from where Frye was tasered and he could see the taser probes go into Frye. Exhibit D, pp. 22 – 24.

**RESPONSE:** **Undisputed.**

43. Ryan Frye ended up in the back of the police vehicle with taser probes in his back. Exhibit A. p. 83.

**RESPONSE:** **Undisputed.**

## ARGUMENT

### I. FRYE CONCEDES THAT CHIEF ADAMS IS ENTITLED TO SUMMARY JUDGEMENT.

Plaintiff makes no response to Adams' motion for summary judgment. Failure to respond is a sufficient basis to dismiss Adams from the lawsuit. *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010). Count II of Plaintiff's Complaint alleges that Adams, the Police Chief at the time of the incident, failed to train and supervise Sgt. Lynn and Cpl. Pettit. Adams stands on the arguments made in his summary judgment brief. He should be dismissed.

Noteworthy, Frye alleges in his statement of facts (*see* p. 6, ¶ 35) that Sgt. Lynn was not certified for taser use. Unexplainably, Sgt. Lynn's taser training certification and a taser use award are included in the training materials submitted by Plaintiff in Exhibit 1. (*See* Bates #204 and 202). Both Lynn and Pettit were certified in the use of a taser. The failure to train and supervise claim is wholly without merit.

Finally, Defendant Adams expresses his disappointment in being named a Defendant and forced to file for summary judgment. Counsel for Adams wrote to Plaintiff's counsel on multiple

occasions requesting dismissal.[1] It is borderline bad faith to reject multiple dismissal requests and then make no response to a summary judgment motion.

## II.   THE USE OF FORCE WAS REASONABLE UNDER THE CIRCUMSTANCES.

Frye contends he erred in not pleading the excessive force count under a Fourteenth Amendment analysis. To the contrary, this case is properly analyzed under the Fourth Amendment. Frye had yet to be taken into custody by the Logan County Jail, and had yet to even begin his booking process (Def. SOF ¶¶ 18-34). Prior to, and even during the booking process, the Fourth Amendment, not the Fourteenth Amendment, controls the fact scenario. *Dockery v. Blackburn*, 911 F.3d 458, 460-461 (7th Cir. 2018) (Plaintiff alleged that excessive force was used during his booking process, the case was analyzed under the Fourth Amendment).[2] Regardless, even if this Court analyzes Plaintiff's claims under both the Fourth and Fourteenth Amendments, the standard is virtually the same, and the Defendants' use of force was reasonable under either Amendment.

This case is a garden-variety use of force incident analyzed under *Graham v. Connor,* 490 U.S. 386 (1989). Frye conveniently ignores certain *Graham* factors, such as the factor considering the severity of Frye's crime that triggered the chain of events leading to his tasing. Unfortunately for Frye, the case law—including caselaw Frye cites to—makes clear that the severity of the crime is to be given "careful attention[.]" *Graham v. Connor*, 490 U.S. 386, 396 (1989). To properly apply the reasonableness test, the severity of the crime at issue must be

---

[1] Adams' counsel wrote to Plaintiff's counsel on May 18, 2022, June 1, 2022, August 10, 2022, October 6, 2022, and October 31, 2022, pursuing the dismissal of Adams for lack of a proper claim for improper training and supervision. Plaintiff's counsel refused to dismiss Adams from the case.

[2] *See also Winder v. Meyers*, 2004 WL 3121304, *2 (N.D. Ill. 2004) (Plaintiff alleged excessive force was utilized after he was taken into the booking area of the jail, the case was analyzed under the Fourth Amendment); *Swift v. Rinella*, 2008 WL 4792700, *2 (S.D. Ill. 2008) (Plaintiff alleged that during the booking process excessive force was used and his rights were denied under the Fourth and Fourteen Amendments, among others. The court stated definitively that the excessive force claim was to be analyzed under the Fourth Amendment.)

considered when analyzing the totality of the circumstances. *Id.* Frye flips the script and paints himself as a victim, despite being a perpetrator. Frye's arrest, which included a serious domestic violence offense, for which Frye was later sentenced to five years in prison, forms the backdrop for the incident in the sally port (Def. SOF ¶ 14). Additionally, Frye's lack of cooperation and active resistance factor into the use of force (Def. SOF ¶¶ 18-33). Under *Graham*, the above facts are relevant because the actions that a reasonable officer would consider and perceive during the events are relevant. Frye's internal monologue or theories regarding his or Sgt. Lynn's subjective intents are irrelevant because the subjective thoughts or intent of the arrestee are irrelevant when analyzing the reasonableness of an officer's actions. *Graham*, 490 U.S. at 396; *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 724 (7th Cir. 2013).

Even if Defendants conceded Frye's allegations that the Defendants did not fear Frye and that Frye was merely defending himself from a perceived attack, summary judgment should still issue for the Defendants. The sally port video (Ex. E at 1:53 to 1:55) shows Frye's aggressive move toward Sgt. Lynn that, taken alone, justifies the force used to restrain and then tase Frye. The parties agree that the sally port video accurately portrays the scene. The Defendants confidently assert the video shows actions by Frye that were threatening and required force to restrain and control.

Without video, this case probably is a jury case, yet with video showing Frye's actions that justifies use of force, this is a case for summary judgement. The Court can believe everything Frye says up until the time of the video. The Court can even believe everything Frye says about his intent and what happened during the video—where Frye's statements are not contradicted by the video—yet Defendants are still entitled to summary judgement. Whether he was balling up to defend himself or surging forward at Sgt. Lynn, Frye's movement would be

seen by a reasonable officer as a threat. Further, whether Frye was attempting to keep his balance or actively resist with the intent to kick officers, Frye's movements would be perceived by a reasonable officer as active resistance.

Frye argues that his actions were provoked by Sgt. Lynn's approach, and therefore Cpl. Pettit and Sgt. Lynn's response to Frye's threatening actions was unreasonable. This is not founded in the law, and Plaintiff does not cite any supporting law for this contention. To the contrary, Frye argues in favor of a provocation doctrine argument and has been roundly rejected by the United States Supreme Court. The Supreme Court easily dispatched use of the provocation doctrine by noting that the "Fourth Amendment provides no basis for such a rule." *County of Los Angeles, Calif. v. Mendez*, 581 U.S. 420, 422 (2017). And that the provocation doctrine is "incompatible with [the United States'] excessive force jurisprudence." *Id.* at 427. Notably, the Seventh Circuit consistently applies *Mendez* when analyzing excessive force claims. *See i.e., Horton v. Pobjecky*, 883 F.3d 941, 949 (7th Cir. 2018); *Doornbos v. City of Chicago*, 868 F.3d 572, 579 (7th Cir. 2017); *Harrington v. Duszak*, 971 F.3d 739, 741 (7th Cir. 2020); *Gysan v. Francisko*, 965 F.3d 567, 569-70 (7th Cir. 2020). Frye's diversion should be ignored. Instead, the *Graham* factors alone are considered "*[t]he* framework for analyzing excessive force claims." *Graham* at 429.

Defendants take no issue with numerous cases cited by Frye that prohibit tasing a compliant or passively resisting subject.[3] The Defendants did not subdue or tase Frye because he

---

[3] For example, *Alicea v. Thomas*, 815 F.3d 283, 289 (7th Cir. 2016), found summary judgement should not be granted for defendants, however, that was because the court considered it unreasonable to use significant force once a suspect has *stopped resisting or evading arrest*. And more importantly, if plaintiff's series of events were believed it is possible that the force was used once he was compliant. Here, Frye's version of events is ultimately irrelevant due to the video evidence.
    Another example can be seen in *Smith v. Finkley*, 10 F.4th 725 (7th Cir. 2021) where a factual dispute as to whether plaintiff's movements towards the ground were to surrender or grab a weapon. And the video was not sufficient to make a determination on this question due to what it failed to capture. That is not an issue here because

avoided having his temperature taken. Frye was not compliant. Frye can argue his intent was not to resist, but Frye's physical actions—captured on video—make clear he was not under the physical control of Cpl. Pettit or Sgt. Lynn until they used force to subdue him (Def. SOF ¶¶ 30-33). That force, as Frye continued to physically resist officers, reasonably included tasing Frye.

In summary, Frye committed a violent crime and was taken to the Logan County Jail sally port where Frye resisted officers' attempts to process him—by his own admission (Def. SOF ¶¶ 14, 27-28, 30-31). Frye then acted in a threatening manner towards officers, and officers responded by quickly and efficiently subduing Frye with one taser strike. All of these events were clearly captured on video, eliminating any factual confusion about what occurred in the sally port. Frye's intent is irrelevant under the law, and a reasonable officer would perceive Frye to be a threat, not a compliant arrestee. Cpl. Pettit acted reasonably to restrain Frye and Sgt. Lynn acted reasonably in tasing an actively resisting subject. The Fourth Amendment was not violated and the Defendants are entitled to summary judgment.

## III.    SGT. LYNN AND CPL. PETTIT ARE ENTITLED TO QUALIFIED IMMUNITY.

Plaintiff cites to no applicable case law that places Sgt. Lynn or Cpl. Pettit on notice that their actions regarding Frye violated his constitutional rights. Rather, the case law supports the control and tasing of a non-compliant active resister. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 726-27 (7th Cir. 2013). The sally port video adequately shows Frye making an aggressive move requiring control and permitting the use of a taser. Qualified immunity applies to absolve Lynn and Pettit of any liability for money damages.

---

Frye's movements cannot be perceived as Frye attempting to surrender himself or act in a compliant fashion to any reasonable officer. And the video depicts a clear un-biased version of the key events as they occurred.

## IV. FRYE'S STATE LAW CLAIM FOR BATTERY SHOULD BE DISMISSED.

Frye concedes in his responsive brief that he must prove Defendants' conduct was willful and wanton to prevail on his state law battery claim. Frye contends that Sgt. Lynn had a vendetta against Frye, thereby creating the willful and wanton action of tasing Frye. Regardless of any ill will between Frye and Lynn, an objectively reasonable use of a taser (accepted police control device) defeats Frye's argument. If the Court finds the Defendants' use of force reasonable under the Fourth Amendment, Plaintiff fails to state a proper state law battery claim. *Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001).

If the Court grants summary judgment on Frye's federal claims, his state law claim should be dismissed. As discussed in Defendants' original brief, the standard for Frye's state law claim is at least as high, if not higher than the objective reasonableness standard.

Alternatively, this Court could relinquish jurisdiction over the state law claims, as was also discussed in Defendants' original brief on this matter.

### CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment in their favor.

Respectfully submitted,

HERVAS, CONDON & BERSANI, P.C.

**s/ Kaleah M. Ault**
KALEAH M. AULT, *Attorney for Defendants*

CHARLES E. HERVAS, ARDC No. 06185117
KALEAH M. AULT, ARDC No. 06332424
HERVAS, CONDON & BERSANI, P.C.
333 W. Pierce Road, Suite 195
Itasca, IL 60143-3156
P: 630-773-4774  F: 630-773-4851
chervas@hcbattorneys.com
kault@hcbattorneys.com

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RYAN FRYE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-CV-1272 |
| | ) | |
| vs. | ) | |
| | ) | Judge Sara Darrow |
| CITY OF LINCOLN, a Municipal Corporation, | ) | |
| Lincoln Police Sgt. KEVIN LYNN, Individually | ) | Magistrate Judge Jonathan E. Hawley |
| and as Agent or Employee of City of Lincoln, | ) | |
| Lincoln Police Corporal SHAWN PETTIT, | ) | |
| Individually and as Agent or Employee of | ) | |
| City of Lincoln, Lincoln Police Chief | ) | |
| PAUL ADAMS, Individually and as Agent | ) | |
| or Employee of City of Lincoln, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on **July 12, 2023** I electronically filed the foregoing ***Defendants' Reply Memorandum in Support of their Motion for Summary Judgment*** with the Clerk of the District Court for the Central District of Illinois, Springfield Division, using the CM/ECF system, which will send notification to the following CM/ECF participants:

TO:     Mr. James M. Kelly
        Jason Jording
        Jay L. Cohen
        James Kelly Law Firm
        7817 N. Knoxville Ave.
        Peoria, IL 61614
        jim@jameskellylawfirm.com
        jasonj@jameskellylawfirm.com
        jayc@jameskellylawfirm.com

**/s/ Kaleah M. Ault**

CHARLES E. HERVAS, ARDC No. 06185117
KALEAH M. AULT, ARDC No. 06332424
*Attorneys for Defendants*
HERVAS, CONDON & BERSANI, P.C.
333 Pierce Road, Suite 195
Itasca, IL 60143-3156   630-773-4774
chervas@hcbattorneys.com
kault@hcbattorneys.com